[No. 3626-0-III.   Division Three.   July 14, 1981.]

YAMAHA MOTOR CORPORATION, *Respondent,* v. NORMAN J. HARRIS, ET AL, *Appellants.*

*Leo C. Kendrick, J. Thomas Carrato*, and *Gavin, Robinson, Kendrick, Redman & Mays*, for appellants.

*F. Joe Falk, Jr.*, and *Walters, Whitaker, Finney & Falk*, for respondent.

GREEN, J.—Norman J. and Mary Ann Harris appeal the denial of a motion to vacate an order of arrest and the sanctions imposed for contempt of a payment order.

Several questions are presented: (1) Was it error to have entered the pretrial payment order? (2) Did the order imposing the sanction of imprisonment for failure to comply with the payment order violate the constitutional prohibition against imprisonment for debt? (3) Was the finding that Mr. Harris was able to comply with the pay-

ment order supported by the evidence? and (4) Did the court err when it dismissed a counterclaim as a sanction for civil contempt?

In 1973 Mr. Harris and his wife, owners of Mid–Valley Cycle in Toppenish, became a dealer for Yamaha snowmobiles and parts. In 1974 Mid–Valley Cycle was authorized to operate a second dealership known as Mid–Valley Cycle No. 2 at Driftwood Acres, Inc., in Roslyn. In May 1977 Driftwood Acres, Mr. Harris being the sole stockholder, sold all its assets including the Yamaha parts inventory and franchise to Francis W. Martin and his wife for $268,000. Yamaha Motor Corporation's district manager approved the transfer of the franchise for Driftwood Acres to Mr. Martin. As part of the transaction, Mr. Harris signed a voluntary termination of his franchise at the Driftwood location.

Mr. Martin encountered financial difficulties and on April 29, 1978, executed a quitclaim deed to Driftwood Acres in lieu of forfeiture of the purchase contract. This deed included a reconveyance of the "Yamaha part inventory and franchise . . ." On May 2, after the reconveyance, Mr. Martin executed a voluntary termination of the franchise. Mr. Harris notified Yamaha's representatives of the reconveyance and requested the Yamaha dealership. According to Yamaha, it told Mr. Harris that since he had given up the dealership he would have to compete for reinstatement. To the contrary, Mr. Harris stated Yamaha's regional manager told him the Roslyn area would be held open for 1 year to see whether Harris would operate or sell Driftwood Acres; meanwhile, the 1978–79 season was Mr. Harris' area "to do his own thing with." In August 1978 Yamaha awarded the Roslyn area dealership to a Jack Wadkins, a Cle Elum dealer.

Earlier in 1978, Mr. Harris ordered 92 snowmobiles. Thirty–eight snowmobiles arrived in August 1978 and 15 to 20 were displayed at Harris' Driftwood Acres. These snowmobiles were covered by a security agreement. When Yamaha learned of the continued sale of their snowmobiles

at Driftwood Acres, they immediately notified Mr. Harris to stop selling them and remove their sign. Mr. Harris refused.

On October 18, 1978, Yamaha commenced this action for injunctive relief, claiming the sale of Yamaha products at Driftwood violated the Mid–Valley Cycle dealer agreement and their security agreement. On November 1, Yamaha notified Mr. Harris that his dealership at Mid–Valley Cycle in Toppenish was terminated pursuant to section 6.02(d)[1] of their dealer agreement. Notwithstanding, Mr. Harris continued to represent himself as a Yamaha dealer and to sell and service Yamaha products at both Driftwood Acres and Mid–Valley Cycle. As a result, Yamaha amended its complaint and sought: (1) a preliminary injunction without bond to: (a) restrain Mr. Harris from acting as a Yamaha snowmobile dealer at Driftwood Acres and Mid–Valley Cycle, (b) require Mr. Harris to allow an inventory of all unsold Yamaha products and permit Yamaha to repurchase those products, and (c) order Mr. Harris to pay into the registry of the court a sum of money equal to the amount currently owed by Mr. Harris to Yamaha from the sale of Yamaha products; (2) an order foreclosing Yamaha's security interest in Mr. Harris' Yamaha inventory and allowing replevin of such inventory; and (3) money damages and attorney's fees.

Mr. Harris filed a counterclaim alleging (1) Yamaha violated RCW 46.70.180(10)(b) by canceling Mr. Harris' franchise without compensating him for his capital and other investments in the dealerships, entitling him to attorney's fees; (2) damages; and requesting (3) Yamaha be required

---

[1]Section 6.02(d) of the dealership agreement provides:

*Termination for Cause (Immediate Effect).* Unless otherwise provided for or allowed under state law, Yamaha may terminate this Agreement with immediate effect on the giving of written notice to Dealer should any of the following events occur, such events being of such a nature so as to constitute good cause for immediate termination by Yamaha:

"...

"(d) Any relocation or establishment of branch locations without having complied with the requirements set forth in paragraph 1.01 of this Agreement."

to establish him as its franchise dealer; (4) Yamaha be enjoined from supplying and permitting Mr. Wadkins to operate in competition with Harris' Driftwood Acres; and (5) Yamaha be compelled to supply Mr. Harris with snowmobiles and other products during the pendency of this action.

During the hearing on Yamaha's request for preliminary injunction on November 30, 1978, Mr. Harris testified:

Q. How many Yamaha snowmobiles have you sold that were floored that you haven't paid Yamaha for yet?
A. I couldn't tell you.
Q. Do you have records of that?
A. My wife could tell you exactly, but I never looked and I couldn't tell you.
Q. If this court were to order you to account for those proceeds, you could do so from your records?
A. Yes, sir.
Q. And are those proceeds available?
A. Yes, sir.
Q. You haven't spent them?
A. No, sir. They are in a savings account in a bank.
Q. In fact, have you made a meticulous effort to make sure that those proceeds can be accounted for?
A. Yes, sir.
Q. And this is true for all of the floored units you have sold that Yamaha has not been paid for?
A. Yes, sir.
Q. And this includes the three units that you attempted to pay for on the check that was returned?
A. I couldn't tell you if that money had been transferred to savings or not. It will be if it is not.

Yamaha's request was denied. When Yamaha moved for reconsideration and replevin, the court in an oral decision, stated:

I think that to the extent that Yamaha products have been sold, the very least that Mr. Harris ought to do is to pay that money into court, and I would so order. If he has a setoff, he is so protected.

On December 22, an order was entered requiring Mr. Harris to deposit into court a sum of money equal to the amount Mr. Harris owed or will owe Yamaha from past and future

sales of Yamaha products.

On April 3, 1979, Mr. Harris petitioned to modify this order, alleging inability to pay, and he sought to have the amount reduced and offset by unencumbered Yamaha inventory in his possession. On April 6, Yamaha moved to have Mr. Harris held in contempt for willfully failing to comply with the payment order. The court found Mr. Harris in contempt and sentenced him to 10 days in jail suspended on condition he comply with the payment order by July 1, 1979. Mr. Harris did not comply and on August 27 Yamaha moved to have him jailed and his counterclaim dismissed without prejudice. On September 4, Mr. Harris moved to vacate the contempt order.

At the hearing on these opposing motions, Mr. Harris again asserted his inability to pay the ordered sum into court. After the hearing, an order was entered: (1) denying Mr. Harris' motion to vacate; (2) vacating the suspension of the jail sentence and committing him to jail for 10 days; (3) dismissing Mr. Harris' counterclaim without prejudice; and (4) awarding Yamaha attorney's fees. Mr. Harris appeals.

Mr. Harris' six assignments of error presenting 10 issues are grouped into the following three categories.

## I

### PAYMENT ORDER

Mr. Harris contends the court erred in entering the order because it constituted a grant of equitable relief on insufficient grounds. Therefore, the order was void ab initio. We disagree. The payment order was based on RCW 4.44.480,[2] rather than equity. This statute authorizes the court to order a party to deposit in court money which is due another party with or without security. Here, money was

---

[2]RCW 4.44.480 provides:

"When it is admitted by the pleading or examination of a party, that he has in his possession, or under his control, any money, or other thing capable of delivery, which being the subject of the litigation . . . which belongs or is due to another party, the court may order the same to be deposited in court, or delivered to such party, with or without security, subject to the further direction of the court."

due Yamaha under its security agreement with Mr. Harris[3] and by virtue of RCW 62A.9–306(2).[4]

Harris also contends the court erred in failing to require Yamaha to post bond. We disagree. RCW 4.44.480 provides the court may order the deposit of money into the court "with or without security." "The setting of a bond is a matter solely within the discretion of the trial court". *Hockley v. Hargitt,* 82 Wn.2d 337, 345, 510 P.2d 1123 (1973). Mr. Harris does not allege an abuse of discretion, nor does the record reveal any abuse.

## II

### CONTEMPT

Mr. Harris contends the payment order was equivalent to a direction to pay a debt and his imprisonment for contempt of the order violated article 1, section 17 of the State Constitution prohibiting imprisonment for debt. We disagree.

RCW 4.44.490[5] allows the court to treat as contempt

---

[3]Paragraph 2 of the security agreement provides:

"In order to induce Secured Party to finance the acquisition by Debtor of the aforementioned types of personal property from time to time during the term of this Agreement, Debtor hereby assigns, transfers and sets over unto Secured Party, all of Debtor's right, title and interest in and to, and grants to Secured Party a security interest in (1) all such personal property now in Debtor's possession (2) all such personal property hereafter acquired from Secured Party by Debtor and (3) all proceeds of all such existing or hereafter acquired personal property, and all such personal property returned or repossessed, as security for the payment in full of (a) all existing obligations of Debtor to Secured Party arising out of the purchase by Debtor of personal property from Secured Party, (b) all obligations of Debtor to Secured Party arising hereafter on account of sales of personal property to Debtor by Secured Party, and (c) all other obligations owed by Debtor to Secured Party whether now existing or hereafter arising."

[4]RCW 62A.9–306(2) provides:

"Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

[5]RCW 4.44.490 provides:

disobedience of an order for the deposit or delivery of money. *See also State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 87 Wn.2d 327, 330, 553 P.2d 442 (1976), *appeal dismissed*, 430 U.S. 952, 51 L. Ed. 2d 801, 97 S. Ct. 1594 (1977). Contempt of court is punishable either by statute, RCW 9.23.010 and 7.20.020, or pursuant to the court's inherent contempt power. *Burke & Thomas, Inc. v. International Organization of Masters, Mates & Pilots*, 92 Wn.2d 762, 776, 600 P.2d 1282 (1979). Fine or imprisonment, or both, are prescribed by RCW 7.20.020[6] for civil contempt. The court may use its inherent contempt power to coerce compliance with its lawful order and is not limited in its exercise of this power by the punishments prescribed by the civil contempt statute. *Burke & Thomas, Inc. v. International Organization of Masters, Mates & Pilots, supra* at 776. *See also State v. Ralph Williams' N.W. Chrysler Plymouth, Inc., supra* at 336–37. The coercive sanctions imposed for contempt lay within the sound discretion of the trial court, and its action will not be disturbed absent a clear showing of abuse. *Schuster v. Schuster*, 90 Wn.2d 626, 630, 585 P.2d 130 (1978); *State v. Caffrey*, 70 Wn.2d 120, 122, 422 P.2d 307 (1966); *State v. Nelson*, 14 Wn. App. 658, 666, 545 P.2d 36 (1975). The decisions discussing imprisonment as a sanction for contempt indicate the court should utilize imprisonment only when no reasonable or effective alternatives are available. *Rainier Nat'l Bank v. McCracken*, 26 Wn. App. 498, 516,

---

"Whenever, in the exercise of its authority, a court shall have ordered the deposit or delivery of money or other thing, and the order is disobeyed, the court, besides punishing the disobedience as for contempt, may make . . ."

[6]RCW 7.20.020 states:

"Every court of justice, and every judicial officer has power to punish contempt by fine or imprisonment, or both. But such fine shall not exceed three hundred dollars, nor the imprisonment six months; and when the contempt is not of those mentioned in RCW 7.20.010(1) and (2), it must appear that the right or remedy of a party to an action, suit or proceeding was defeated or prejudiced thereby, before the contempt can be punished otherwise than by a fine not exceeding one hundred dollars."

615 P.2d 469 (1980); *State v. Nelson, supra* at 667. Here, the trial court determined no effective alternatives were available. Mr. Harris does not claim an abuse of discretion by the trial court and a careful review of the record reveals none. Consequently, the court was authorized to enter the contempt order, unless the payment order violated the constitutional prohibition against imprisonment for debt. No Washington cases have been brought to our attention resolving this issue.

Other jurisdictions have held that mere failure to pay a debt is not punishable by imprisonment; however, when a proper order or judgment has been entered, one who stands in willful disobedience may be found in contempt and punished by imprisonment. *Thomas v. Thomas,* 569 P.2d 1119 (Utah 1977); *Salvesen v. Salvesen,* 370 Mass. 608, 351 N.E.2d 499 (1976); *French v. Pobst,* 203 Va. 704, 127 S.E.2d 137 (1962). We know of no reason to depart from the rationale of these decisions. Here, the payment order does not direct Mr. Harris to pay any money to Yamaha; rather, he is to pay the money into court where it will be held pending the outcome of the action. Consequently, the payment order did not create a debt in favor of Yamaha. Therefore, the contempt order was constitutionally entered.

Mr. Harris also contends there is insufficient evidence to support the trial court's findings[7] concerning his ability to comply with the payment order. He argues his claimed

---

[7]Finding of fact No. 3:

"That at the time the aforesaid order [of December 22, 1978] was entered, the said proceeds of collateral constituted a specific and identifiable fund which the defendants Harris had the ability to account for if called upon to do so by this court."

Finding of fact No. 5:

"That based upon the testimony of the defendant, N. Jeff Harris, and the other evidence presented at said hearing, this court concluded and found that the said defendant had demonstrated a lack of good faith in the disposition which he made of the proceeds received from the sale of the plaintiff's collateral and that he knowingly and willfully failed to comply with this court's order of December 22, 1978, notwithstanding that he had the ability to do so during the interim time."

inability to pay is a complete defense to the contempt order. We disagree.

Findings of fact will not be disturbed on appeal if there is substantial evidence to support the finding. *Davis v. Department of Labor & Indus.,* 94 Wn.2d 119, 615 P.2d 1279 (1980). Here, there is testimony that Mr. Harris had the ability to comply with the payment order. He voluntarily used funds he initially testified were set aside for Yamaha to pay bank loans and business expenses. Further, the evidence showed he had sales at his Toppenish store, Mid–Valley Cycle, in excess of $1 million during the first 4 months of 1979. It follows there is substantial evidence to support a finding that Mr. Harris had the ability to comply with the payment order. We find no error in the entry of the contempt order. RCW 7.20.110.[8]

### III
### DISMISSAL OF COUNTERCLAIM

Mr. Harris contends the court erred in dismissing his counterclaim as a coercive sanction for contempt. We agree.

Although the court, exercising its inherent contempt power, is not limited to the punishments prescribed by the statute, *Burke & Thomas, Inc., supra* at 776, the old and well established rule is that the sanction of striking a pleading may not be exercised as a penalty for contempt. *Hovey v. Elliott,* 167 U.S. 409, 42 L. Ed. 215, 17 S. Ct. 841 (1879); *State ex rel. Hunter v. Ronald,* 106 Wash. 413, 180 P. 125 (1919). However, the court may not hear the issue raised in the pleading until a party clears the contempt. *State ex rel. Hunter v. Ronald, supra; Johnson v. Johnson,* 560 P.2d 1132 (Utah 1977); *In re Morrell,* 174 Ohio St. 427, 189 N.E.2d 873 (1963). We find the court's dismissal of Mr. Harris' counterclaim without prejudice was error. There-

---

[8]RCW 7.20.110 provides:

"When the contempt consists in the omission or refusal to perform an act which is yet in the power of the defendant to perform, he may be imprisoned until he shall have performed it, and in such case the act must be specified in the warrant of commitment."

fore, the counterclaim is reinstated; however, trial of the counterclaim is postponed until Mr. Harris purges himself of contempt.

The contempt order is affirmed except as to the dismissal of the counterclaim which is reversed.

McINTURFF, C.J., and MUNSON, J., concur.

Reconsideration denied August 28, 1981.

Review denied by Supreme Court November 6, 1981.