671 P.2d 473

**Ellen MARKS, Petitioner,**

v.

**Honorable Karen J. VEHLOW, Magistrate of the Fourth Judicial District of the State of Idaho, the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada, and the Magistrate's Division Thereof, Respondent.**

**No. 13938.**

Supreme Court of Idaho.

Oct. 21, 1983.

P. Craig Storti and Robert L. Bilow, of Hawley, Troxell, Ennis & Hawley, Howard I. Manweiler, of Manweiler & Bevis, Boise, for petitioner.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for respondent.

DONALDSON, Chief Justice.

Michael Clary was awarded custody of his natural daughter Alysia Clary, a minor child, pursuant to an Arizona divorce decree issued on May 12, 1975. Following the divorce, Mr. Clary and Alysia lived in Nebras-ka. In the summer of 1980, while the child was visiting with her natural mother Eugenia (Clary) Gilmore, in Idaho, Mrs. Gilmore filed a motion for temporary possession of Alysia in Nebraska. The Nebraska court denied the motion and entered a modified order on September 5, 1980, which required that Eugenia Gilmore return the child to the custody of her natural father pending further investigation and evaluation. The child was not returned and on September 9, 1980, Michael Clary filed a petition for a writ of habeas corpus in the Fourth Judicial District of the State of Idaho, Ada County, seeking a writ commanding Eugenia and Randall Gilmore (her husband) to bring the child before the court. The writ was issued and served on Randall Gilmore on September 9, 1980, commanding that Alysia be brought before Magistrate Vehlow on September 10, 1980.

On September 10, 1980, Randall Gilmore appeared before Magistrate Vehlow without the child. After Gilmore was questioned under oath, the magistrate held him in contempt of court and committed him to jail. The magistrate also issued a warrant for the arrest of Eugenia Gilmore and set a hearing for September 18, 1980, at 9:00 a.m., to review the contempt of Mr. Gilmore. On September 18, 1980, a newspaper, *The Idaho Statesman,* published an article written by the petitioner, Ellen Marks, a reporter, which related a recent interview concerning the child between Marks and Mrs. Gilmore. Also on September 18, 1980, Marks went to the courthouse to attend the hearing on Mr. Gilmore. While waiting for the proceedings to commence, Marks was served with a subpoena by Mr. Clary's counsel. Shortly after receiving the subpoena, Marks left the courtroom. Thereafter, Mr. Clary's counsel moved for a bench warrant for the arrest of Marks which the magistrate indicated would issue upon written proof of service. Later Marks, by counsel, moved to have the subpoena quashed for ineffective service. The motion to quash was denied and a bench warrant was issued. A motion to quash the bench warrant was filed on September 18, 1980.

On September 19, 1980, Marks appeared before the magistrate court. Argument by counsel was made on the motion to quash the warrant and such motion was denied. Marks was called to the witness stand and refused to answer certain questions regarding the whereabouts of the child, Alysia Clary, based upon an assertion of first amendment rights. Following argument to the court, the magistrate found Marks in contempt of court and ordered her incarcerated pending compliance. The order was modified on October 7, 1980, to a fine of $500.00 for each and every day that Marks refused to answer the questions propounded on September 19, 1980. A further order of contempt was filed on October 14, 1980.

Petitioner attempted to appeal the orders of contempt to this Court which attempt was dismissed as being from nonappealable orders.

The contempt sanction continued to run against Marks until receipt by the magistrate court of a stipulation that the child had been returned to the father. A final order was filed on February 2, 1981, which terminated the sanction effective January 26, 1981. Thereafter, Marks filed a petition for a writ of review in this Court. We affirm.

■ Where orders of contempt are examined under a writ of review[1] the prime question for determination is whether the inferior tribunal exceeded its jurisdiction. *E.g., Dutton v. District Court of Third Judicial District in and for County of Owyhee,* 95 Idaho 720, 518 P.2d 1182 (1974); *Barnett v. Reed,* 93 Idaho 319, 460 P.2d 744 (1969). Our initial inquiry must therefore focus upon whether the magistrate possessed subject matter jurisdiction power to order the contempt sanctions imposed. We will also consider whether there exists a valid news-

man's testimonial privilege which should have shielded Marks from the orders of contempt.

## I.

■ An attorney magistrate is a judicial officer of the district court whose jurisdiction is established by legislation, I.C. §§ 1–2208, 1–2210; under the Idaho Constitution, ID. Const. art. 5, § 2; by rule of the Idaho Supreme Court, I.R.C.P. 82; and by the rules of the respective district courts, *e.g.,* 4th Judicial District Court Rule 3.0 (1979). An attorney magistrate may be empowered and clothed with jurisdiction to conduct proceedings in habeas corpus and child custody matters. I.C. § 1–2210.

■ A writ of habeas corpus was issued and served on Randall Gilmore commanding that Alysia Clary be brought before Magistrate Vehlow on September 10, 1980. At the September 10, 1980, proceeding the magistrate held Gilmore in contempt, ordered him committed to jail, and set a hearing for September 18, 1980. It is argued by Marks that the September 18 hearing was limited to a review of the contempt of Randall Gilmore.[2] From this argument and the subsequent voiding of the order of contempt against Gilmore and his discharge from custody by the district court under separate habeas corpus proceedings, Marks contends that there was no jurisdiction to support the September 18 hearing. Without jurisdiction for the September 18 hearing, similarly there would be no jurisdiction for the subsequent proceedings at which Marks was held in contempt. We do not agree. From our review of the record, we conclude that the September 18 hearing was a continuing part of the initial habeas corpus proceeding.[3] We conclude that the

---

1. The review is limited by statute. I.C. § 7–208. Section 7–208 provides:

 "The review upon this writ cannot be extended further than to determine whether the inferior tribunal, board or officer has regularly pursued the authority of such tribunal, board or officer."

2. The magistrate in her "Memorandum Opinion, Order for Contempt and Order for Warrant of Arrest (H.C. 1643)" ordered:

 "A hearing to review the status of respondent Randall Gilmore's contempt is set for Thursday, September 18, 1980 at 9:00 A.M."

3. The order for the appearance of Randall Gilmore at the September 18 hearing before Magistrate Vehlow recited that

magistrate court had proper jurisdiction to conduct the September 18 hearing and the subsequent hearings in furtherance of the habeas corpus proceeding.

## II.

Ellen Marks was served with a subpoena for the September 18, 1980, hearing on that date. By counsel, she moved to quash the subpoena which motion was denied.[4] Later that same day, upon written return of service, a bench warrant was issued for the arrest of Ellen Marks. A motion to quash the warrant was made, argued on September 19, and denied. Thereafter, Marks was called to the witness stand. During examination, she declined to answer questions directed to the indentities of confidential

> "Randall Gilmore ... be brought before this Court on the 18th day of September 1980, at the hour of 9:00 a.m. for a *review of a Habeas Corpus Petition* ...." (Emphasis added.)

The character of the September 18 hearing is further reflected in its transcript by the following:

> "THE COURT: ... Mr. Gilmore, this hearing was *set up to basically review the habeas corpus petition* that we went through ... sometime last week, and find out what information you might have at this point on the location of the child, Alysia, or whether in fact of course you know where the child is."

4. Marks contends that she was denied procedural due process under the fourteenth amendment of the United States Constitution and article 1, section 13 of the Idaho Constitution. She argues that she was denied adequate notice of the September 18 hearing and an opportunity for a full and fair hearing during which she could have provided a defense to the effort to compel her testimony. In the circumstances of this case, we believe that Marks was not denied her procedural due process rights. She had counsel who was able to make and be heard on several motions before Marks was required to take the witness stand.

5. The September 19, 1980, Memorandum Opinion, Order of Contempt and Warrant of Commitment recited that:

> "The questions which Ellen Marks refused to answer claiming the above [first amendment] privilege are the following:
> "1) From whom did you first receive your information concerning Mrs. Gilmore?
> "2) Was the individual a male or a female?
> "3) Where did the meeting take place?
> "4) Was that the residence of this person?
> "5) Was Mrs. Gilmore present at the meeting?
> "6) Where did the meeting take place?

sources and the location of a confidential meeting that she had had with the undisclosed confidential sources.[5] The questioning of Marks was aimed at obtaining information about the whereabouts of the child.

The refusal was based upon an assertion that the sources were protected by a qualified newsman's privilege to conceal the identity of confidential sources based upon the first amendment. Magistrate Vehlow recognized no privilege and ordered Marks to answer the questions. Marks refused and Magistrate Vehlow held Marks in contempt and ordered her incarcerated until further order. Marks attempted to appeal this order to this Court on September 26, 1980, which appeal was dismissed.

> "7) Was it indicated to you in the course of any of your conversations that evening whether Mrs. Gilmore and the children were residing in that residence at that time?
> "8) Again, I would like to know the identities of the four adults who were present at the meeting?
> "9) The person with whom you had the first telephone conversation, when did the conversation take place? Yesterday. Who placed that call? I did. Who was the person you called?
> "10) You said you had two conversations with another person. On what days did those take place? Yesterday. Who placed those calls? I placed the first one, the other person placed the second. Who is the person you called? What is the telephone number of the other individual you called that we just discussed?
> "11) How about the other person? The one you called one time yesterday. Is that the same person with whom you first spoke about Mrs. Gilmore? Yes. Did you attempt to obtain a release from your confidentiality agreement in you [sic] conversation with that person? *Yes.* Did or did not that person agree to release you from that promise? *That person did.* But that person does not object to your supplying his or her name. Is that correct? *That's true.* What is the name of that person?
> "12) Is the house where the meeting took place in Garden City?" (Emphasis added.)

In light of our adopted rationale, we need not be concerned with whether Marks waived the privilege by answers made during examination which may reflect that a privilege if once viable was no longer extant.

Marks moved for a stay of execution and enforcement of the September 19, 1980, Order of Contempt and Warrant of Commitment which motion following a hearing on October 6, 1980, was denied on October 7, 1980. Marks was found in contempt for refusing to answer the questions propounded on September 19, 1980, and fined $500. Following an October 7 hearing, Magistrate Vehlow entered an order which modified the previous order of contempt as follows:

"IT IS HEREBY ORDERED AND THIS DOES ORDER that the Order of Contempt entered by this Court on September 19, 1980, be modified to provide that the witness, Ellen Marks, shall pay the sum of FIVE HUNDRED & NO/100THS DOLLARS ($500.00) for each and every day she continues to refuse to answer the questions earlier propounded to her at the hearing on September 19, 1980."

On October 14, 1980, following another hearing, Magistrate Vehlow entered another order of contempt which provided:

"THIS COURT DOES ORDER AND THIS DOES ORDER That for each day that Court is in session that Ms. Marks refuses to purge herself of contempt, that she be fined five hundred dollars ($500.00). All fines accruing under this Order of Contempt are due and payable at the first of every month following the acts of contempt excepting the fines ordered on October 6 and October 7, 1980 which are due and payable on October 14, 1980."

Petitioner Marks contends that Magistrate Vehlow had neither the power to impose the contempt sanctions utilized nor the power to modify the September 19, 1980, order of contempt from incarceration to a daily fine. We disagree. We are mindful of petitioner's arguments for a qualified newsman's privilege which if existing would vitiate these orders of contempt. In due course, we will consider the question of a qualified newsman's privilege.

The attorney magistrate in conducting habeas corpus proceedings exercises the judicial power of the State of Idaho. ID. Const. art. 5, § 2; I.C. §§ 1–2208, 1–2210; I.R.C.P. 82. To vindicate his jurisdiction and proper function, the magistrate is vested with the judicial contempt power. While this power has been recognized by statute, Title 7, chapter 6, I.C., its source lies in the Constitution, ID. Const. art. 5, § 2, and the common law, *McDougall v. Sheridan*, 23 Idaho 191, 128 P. 954 (1913).

I.C. § 1–1603 recognizes that "[e]very court has power: ... 4. To compel obedience to its ... orders," I.C. § 1–1901 recognizes that "[e]very judicial officer has power: ... 2. To compel obedience to his lawful orders, as provided in this code," I.C. § 1–1902 provides that "[f]or the effectual exercise of the powers conferred by the last section [I.C. § 1–1901], a judicial officer may punish for contempt, in the cases provided in this code," and I.C. § 7–601 provides that "[t]he following acts or omissions in respect to a court of justice, or proceedings therein, are contempts of the authority of the court: ... 10. Disobedience of a subpoena duly served, or *refusing to* be sworn or *answer as a witness*." (Emphasis added.) If it is necessary to base Magistrate Vehlow's orders of contempt on statutory authority, we believe that I.C. § 1–1603 provides a sufficient basis. Section 1–1603 does not attempt to delimit the power recognized therein. While Title 7, chapter 6, I.C. provides statutory guidance with respect to contempts, we do not believe that it may constitutionally circumscribe the judicial power, ID. Const. art. 5, § 2, the power recognized by I.C. § 1–1603, or the inherent common law contempt power.

A recalcitrant witness may be cited for contempt. *See In re Niday,* 15 Idaho 559, 98 P. 845 (1908). Continued refusal to answer questions within an area results in but a single contempt of a continuing nature. *Yates v. United States,* 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957). To counter such contempt, civil as well as criminal contempt sanctions may be imposed;[6] how-

---

**6.** Criminal sanctions are penal in nature, while civil sanctions are remedial, compensatory or

ever, the imposition of multiple criminal sanctions is impermissible. *Id.*

Marks was adamant regarding her refusal to answer the questions first propounded on September 19, 1980, which resulted in but a single contempt of a continuing nature. Magistrate Vehlow first imposed a civil sanction when she ordered Marks incarcerated until she purged herself of the contempt. I.C. §§ 7–603, 7–611. At this point, we find no error in this initial ruling.

■■■■ Appellant argues that the magistrate's modification of the order of contempt was made without authority and therefore was void. Appellant contends that the September 19 order of contempt was appealed to the Supreme Court which appeal divested the magistrate of any authority to modify the order. *See* I.A.R. 13(b). However, there is no appeal as of right from a contempt order.[7] *See* I.C. § 7–614; I.A.R. 11. Because this was an attempt to appeal from a nonappealable order, the jurisdiction of the magistrate was not divested under I.A.R. 13(b). *See Phillips v. Phillips,* 41 Cal.2d 869, 264 P.2d 926 (1954); *Wilmurth v. First Judicial District Court,* 80 Nev. 337, 393 P.2d 302 (1964); *see also* 4A C.J.S. *Appeal & Error* § 606, at 394–95 (1957).

■■■■ I.C. § 7–611 addresses a permissible civil sanction—incarceration until compliance—for a contempt which consists of an omission. We believe it noteworthy that § 7–611 is phrased in permissive language—the contemnor *"may* be imprisoned." We hold that § 7–611 does not preclude alternative civil sanctions under the

common law or I.C. § 1–1603. In such instances, the coercive force may be implemented by means of prospective conditional fines. *United States v. Professional Air Traffic Controllers Organization,* 678 F.2d 1 (1st Cir.1982); *G. & C. Merriam Co. v. Webster Dictionary Co., Inc.,* 639 F.2d 29 (1st Cir.1980); *Papa v. New Haven Federation of Teachers,* 186 Conn. 725, 444 A.2d 196 (1982); *Board of Education of City of Shelton v. Shelton Education Association,* 173 Conn. 81, 376 A.2d 1080 (1977); *Brocker v. Brocker,* 429 Pa. 513, 241 A.2d 336 (1968), *cert. denied,* 393 U.S. 1081, 89 S.Ct. 857, 21 L.Ed.2d 773 (1969); *see Hutto v. Finney,* 437 U.S. 678, 690–91, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978); *United States v. United Mine Workers,* 330 U.S. 258, 305, 67 S.Ct. 677, 702, 91 L.Ed. 884 (1947); *Yamaha Motor Corporation, U.S.A. v. Harris,* 29 Wash. App. 859, 631 P.2d 423 (1981). A thorough review of the record reveals that Magistrate Vehlow's subsequent modification of the contempt order to impose a daily $500.00 fine for each day that Marks continued to refuse to answer the questions of September 19, 1980, was to coerce her testimony. This modification did not result in multiple criminal sanctions, but rather constituted a continuing coercive force terminable by compliance of the contemnor—the answering of the questions.[8]

■■■■ The exercise of the broad power to impose civil sanctions which we recognize today is not without limitation. *See Yamaha Motor Corporation, U.S.A. v. Harris,* 29 Wash.App. 859, 631 P.2d 423, 428 (1981)

---

coercive in nature. *See Shillitani v. United States,* 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *Yates v. United States,* 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957); *United States v. United Mine Workers,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911).

7. While this Court has plenary power, ID. Const. art. 5, § 9, to review a contempt case, *Lester v. Lester,* 99 Idaho 250, 580 P.2d 853 (1978), and contempt orders, *Parker v. Parker,* 97 Idaho 209, 541 P.2d 1177 (1975); *Jones v. Jones,* 91 Idaho 578, 428 P.2d 497 (1967) (Taylor, C.J., concurring specially), we believe that

in the usual case such as this that a writ of review remains the proper method of securing review of a contempt order, *e.g., Glenn Dale Ranches, Inc. v. Shaub,* 95 Idaho 853, 522 P.2d 61 (1974); *Barnett v. Reed,* 93 Idaho 319, 460 P.2d 744 (1969).

8. *Cf. Shillitani v. United States,* 384 U.S. 364, 368, 86 S.Ct. 1531, 1534, 16 L.Ed.2d 622 (1966) ("When the petitioners carry 'the keys of their prison in their own pockets,' the action 'is essentially a civil remedy designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial decrees.'" (Citations omitted.)).

("The coercive sanctions imposed for contempt lay within the sound discretion of the trial court, and its action will not be disturbed absent a clear showing of abuse"); *cf. Shillitani v. United States,* 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966) ("a court must exercise '[t]he least possible power adequate to the end proposed'"); *United States v. United Mine Workers,* 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947) ("where the purpose is to make the defendant comply, the court's discretion is otherwise exercised. It must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." (Footnote omitted.)). The sanctions imposed will be subject to appellate review under an abuse of discretion standard. Here, we find no abuse of that discretion.

In reaching this conclusion, we had to consider the issue of a qualified newsman's privilege. While numerous cases have considered the newsman's privilege issue, *e.g., Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *Zerilli v. Smith,* 656 F.2d 705 (D.C.Cir.1981); *Carey v. Hume,* 492 F.2d 631 (D.C.Cir.1974) *cert. denied,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed. 2d 661 (1974); *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir. 1980); *United States v. Burke,* 700 F.2d 70 (2d Cir.1983); *In re Petroleum Products Antitrust Litigation,* 680 F.2d 5 (2d Cir. 1982), *cert. denied sub nom. Arizona v. McGraw-Hill, Inc.,* —— U.S. ——, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982); *Baker v. F & F Investment,* 470 F.2d 778 (2d Cir.1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); *Garland v. Torre,* 259 F.2d 545 (2d Cir.), *cert. denied,* 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958); *Riley v. City of Chester,* 612 F.2d 708 (3d Cir.1979); *United States v. Steelhammer,* 539 F.2d 373 (4th Cir.1976) (vacated judgment of contempt), *on reh'g,* 561 F.2d 539 (1977) (affirmed judgment of contempt); *Miller v. Transamerican Press, Inc.,* 621 F.2d 721 (5th Cir. 1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981); *Silkwood v.*

*Kerr-McGee Corporation,* 563 F.2d 433 (10th Cir.1977); *Pankratz v. District Court In and For City and County of Denver,* 199 Colo. 411, 609 P.2d 1101 (1980); *Commonwealth v. Corsetti,* 387 Mass. 1, 438 N.E.2d 805 (1982); *Matter of Roche,* 381 Mass. 624, 411 N.E.2d 466 (1980); *Newburn v. Howard Hughes Medical Institute,* 95 Nev. 368, 594 P.2d 1146 (1979); *Matter of Farber,* 78 N.J. 259, 394 A.2d 330 *cert. denied,* 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978); *Clampitt v. Thurston County,* 98 Wash.2d 638, 658 P.2d 641 (1983); *Senear v. Daily Journal-American,* 97 Wash.2d 148, 641 P.2d 1180 (1982), we have been unable to find any reported cases which have considered the particular question before us. The question is whether there is in Idaho a qualified newsman's privilege which a journalist may assert while a witness in a habeas corpus proceeding.

■ Notwithstanding our basic agreement with the following quotation from *Zerilli v. Smith,* 656 F.2d 705, 711 (D.C.Cir. 1981) (consolidated cases involving leaks of governmental transcripts to newspapers):

"Without an unfettered press, citizens would be far less able to make informed political, social, and economic choices. . . . [T]he press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired. Compelling a reporter to disclose the identity of a source may significantly interfere with his news gathering ability; journalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant." (Footnotes omitted.)

We believe that here the compelling state interests—the sanctity of the writ of habeas corpus and the safety of the child—outweigh any public interest in an unfettered press.

■ We view this case as presenting a unique set of circumstances—a habeas corpus proceeding in which a journalist is a witness. Because we find a compelling and legitimate governmental interest in assur-

ing the efficacy of the writ of habeas corpus, we hold that here there is no qualified newsman's privilege beyond the usual inquiry concerning relevance and materiality of the information sought.[9] Furthermore, we believe that the obligation to attend and to give testimony in a habeas corpus proceeding wherein liberty interests are determined is at least as compelling as the duty to appear before a grand jury, *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *cf. Matter of Farber,* 78 N.J. 259, 394 A.2d 330, 334 (obligation to appear on behalf of a criminal defendant as compelling as duty to appear before a grand jury), *cert. denied,* 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978). The concealing of information or the identities of informants which could lead to the discovery of a person sought by means of habeas corpus proceedings should be discouraged. We therefore decline to establish a specific newsman's privilege with respect to such information.

 Here, a child was sought by means of a writ of habeas corpus.[10] While possible infringement of a journalist's news gathering right may occur by requiring disclosure, the disclosure is essential to assure the continued vitality of habeas corpus proceedings which in turn provide protection against unjustified intrusions upon our individual liberty.

 Marks by her responses on the witness stand clearly revealed that she possessed relevant information. She testified that she had been at a recent meeting at which the child sought by the habeas corpus proceedings was present. Therefore, the location of the meeting and the identities of those present was obviously material and relevant.

 Argument was made that the information had become stale with the passage of time. While this may be true, we will not disturb the orders of contempt because the proper benchmark for determining the relevance of the information is at the onset and such determination need not be repeated.

We affirm.

No costs allowed.

No attorney fees allowed.

BAKES and HUNTLEY, JJ., concur.

SHEPARD, Justice, specially concurring.

I concur in the result obtained by the majority opinion but find it necessary to express my disagreement with its rationale.

As the Supreme Court of the United States has suggested, the first question to be answered is whether the identity of the sources is *relevant.* In *Caldero,* the very crux of the case was whether or not the 'police expert' actually existed, and whether or not he said that which the newspaper published. Relevance was there established beyond quibble." *See also Riley v. City of Chester,* 612 F.2d 708, 718 (3d Cir.1979) ("trial courts should be cautious to avoid an unnecessary confrontation between the courts and the press"). We discern no due process requirement that the journalist be accorded a separate hearing or proceeding at which to determine relevancy and materiality.

9. Relevancy and materiality are to be determined by the trial court. *Cf. Caldero v. Tribune Publishing Co.,* 98 Idaho 288, 305, 562 P.2d 791, 808 (1977) (Donaldson, J., dissenting) ("issue must be resolved on a case-by-case basis"), *cert. denied,* 434 U.S. 930, 98 S.Ct. 418, 54 L.Ed.2d 291 (1977). The determination is vested in the trial court's discretion. Absent an abuse of that discretion, we will not disturb its determination. We note our continuing approval of the following language from *Sierra Life Insurance Co. v. Magic Valley Newspapers, Inc.,* 101 Idaho 795, 801, 623 P.2d 103, 109 (1980) (libel case; disclosure not required as no demonstration of relevance made):

"We recognize that the news media rely upon confidential sources in the preparation of many stories, particularly those involving government or large organizations. The ability to keep the identity of those sources confidential is not infrequently a prerequisite to obtaining information. This interest, while legitimate, is not so paramount that the legitimate discovery needs of a libel plaintiff must bow before it. But by the same token a trial court can be expected to exercise caution when it orders these sources to be revealed.

10. The constitutional due process rights of the child are implicated by consideration of a newsman's privilege. To accord the child sought in the habeas corpus proceedings its due process rights, ID. Const. art. 1, § 13, it is necessary for the interest of the journalist in concealing her confidential sources and information to yield when the testimony sought is material and relevant. The journalist's interest is subordinate to the interest of the child.

After upholding the power of the court to impose the sanctions for contempt, the majority opinion states: "The question is whether there is in Idaho a qualified newsman's privilege which a journalist may assert while a witness in a habeas corpus proceedings." The majority only partially answers the question when it states: "We hold that *here* there is no qualified newsman's privilege beyond the usual inquiry concerning relevance and materiality." (Emphasis supplied.)

Inexplicably missing in the majority opinion (except for a footnote dealing with relevancy and materiality) is this Court's decision in *Caldero v. Tribune Pub. Co.,* 98 Idaho 288, 562 P.2d 791 (1977). A possible explanation is that the author of today's majority was among the dissenters in *Caldero.* In *Caldero,* the Court was squarely presented with the question of an absolute or qualified newsman's privilege under the United States or Idaho Constitution. The Court clearly rejected the existence of either an absolute or qualified privilege under either Constitution. The Court reviewed and applied the decisions of the United States Supreme Court in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *United States v. Bryan,* 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884 (1950); *Blackmer v. United States,* 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932); *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); and *Garland v. Torre,* 259 F.2d 545 (2d Cir.1958), *cert. denied,* 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958), which was cited with approval in *Branzburg v. Hayes, supra.*

As stated by then Judge Potter Stewart in *Garland:*

"If an additional First Amendment liberty—the freedom of the press—is here involved, we do not hesitate to conclude that it too must give place under the Constitution to a paramount public interest in the fair administration of justice. 'The right to sue and defend in the courts is the alternative of force. In an organized society, it is the right conservative of all others, and lies at the foundation of an orderly government.'" 259 F.2d at 549. And as stated by Mr. Justice Byron White in *Branzburg:*

"Until now the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the first amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we *decline to do.*

\* \* \* \* \* \*

"We are admonished that refusal to provide a First Amendment reporter's privilege will undermine the freedom of the press to collect and disseminate news. But this is not the lesson history teaches us. As noted previously, the common law recognized no such privilege, and the constitutional argument was not even asserted until 1958. From the beginning of our country the press has operated without constitutional protection for press informants, and the press has flourished. The existing constitutional rules have not been a serious obstacle to either the development or retention of confidential news sources by the press." (Emphasis supplied.) 408 U.S. at 689–691, 698–699, 92 S.Ct. at 2661, 2665, 33 L.Ed.2d at 644, 649.

In both *Bryan* and *Blackmer,* the United States Supreme Court made clear that the power of testimonial compulsion is effective to the functioning of the courts. In *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the Court emphasized that every man, including the President of the United States, is subject to compulsory process for the production of evidence and stated, "Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." 418 U.S. at 710, 94 S.Ct. at 3108, 41 L.Ed.2d at 1065. In *Pell,* the court held that the search for truth must "override the consequential, but uncertain, burden on news

gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial." 417 U.S. at 833, 94 S.Ct. at 2809, 41 L.Ed.2d at 508, *quoting Branzburg v. Hayes, supra.*

The majority furnishes no authority which in my judgment overturns or modifies the above decisions or language of the United States Supreme Court construing the asserted absolute or qualified privileges. Whatever may be the differences expressed by the lower federal courts or state courts, I have always believed that the decisions of the United States Supreme Court on questions regarding the Constitution of the United States were controlling and binding upon all other courts. I have also believed that, when a question is presented to this Court, the doctrine of stare decisis requires us to examine the previous decisions of this Court bearing on the same question and, unless those previous decisions are overruled or modified, they are dispositive and to be followed.

The majority opinion would seem to imply that *Sierra Life Insurance Co. v. Magic Valley Newspapers, Inc.,* 101 Idaho 795, 623 P.2d 103 (1980), has somehow created a qualified newsman's privilege. If so, I must disagree. As I view *Sierra Life,* it continued the validity of *Caldero,* stating: "The debate over the validity of *Caldero* was apparently put to rest by the United States Supreme Court in *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979)." *Sierra Life, supra,* 101 Idaho at 800, 623 P.2d at 108. The court in *Sierra* then proceeded to discuss whether discovery was being used to harass litigants, which claim it acknowledged was not unique to journalists.

Contrary to the view expressed by the majority here, the Court in *Sierra* did not rule against required disclosure, but rather remanded to the trial court for reconsideration of the relevance question. *Sierra,* in any event, principally dealt with the question of the imposition of appropriate sanctions for refusal to comply with discovery procedures.

Insofar as the majority opinion is to be construed as holding that evidence sought from a witness in open court must be relevant and material to the issues before the court, and that such decision is committed to the sound discretion of the trial court, I have no disagreement. That rule of law is fundamental and now exists as to all witnesses and their testimony, regardless of their professional calling. However, if the opinion of the majority today is to be construed as creating a privilege to refuse to answer a propounded question because, in the *witness'* opinion, it is not material or relevant, I must disagree.

In the instant case, beyond the shadow of a doubt, the testimony sought to be elicited was material and relevant. The courts of two states had placed the legal custody of the child in its father. The child's mother and her husband refused to deliver the child to its legal custodian, concealed the child, and refused to reveal her whereabouts. The legislature of this state has denominated such conduct criminal as constituting the crime of kidnapping. The record reveals that a charge of kidnapping was filed. The instant action was brought in the courts of the State of Idaho, where the child was allegedly being concealed, seeking full faith and credit for the decrees of our sister states and the enforcement of those decrees. As pointed out by the majority, jurisdiction existed both over the cause of action and over the person of appellant Marks.

I agree with the majority in its rejection of the argument of petitioner that the information sought to be elicited from her had become stale with the passage of time. The briefs do reveal that the legal guardian has in fact regained the physical custody of the child, but only after a search of five months and an expenditure of some $17,000. Clearly, that physical custody was gained without the assistance, approval, or cooperation of either the Gilmores or Marks.

572

BISTLINE, Justice, dissenting.

### I.

The majority opinion wholly declines to mention that the issue raised by the petition was the alleged validity of the Nebraska order—an issue which, insofar as the record discloses, was never decided. The majority mentions "the sanctity of the writ of habeas corpus" and "the discovery of a person sought by means of habeas corpus . . . ." The Great Writ, as it has been called, is recognized in our United States Constitution where it is referred to as "The Privilege of the Writ of Habeas Corpus . . . ." Indeed, it is a constitutional right of the highest magnitude, and came to us from the English Habeas Corpus Act of 1679. The history of the Great Writ, however, and its attribute of sanctity stems from its origin "as the writ of habeas corpus ad subjiciendum, by which the legality of the detention of one in custody could be tested judicially." *McNally v. Hill,* 293 U.S. 131, 55 S.Ct. 24, 79 L.Ed. 238 (1934). As I mention, *infra,* the writ has been used as a substitute to try child custody; it is also used, as was intended in this case, to establish and enforce a final custody decree of a foreign state. The majority cites no cases holding that the writ may be used merely to discover from witnesses—not parties—the whereabouts of a child—nor did the instant petition for the writ purport to claim such relief. Habeas corpus petitions will ordinarily be dismissed where an alternative remedy is available, which is especially so where there is a statutory remedy. 39 Am.Jur.2d 140 §§ 18 and 19. *Pettry v. McGinty,* 60 Ohio St.2d 92, 397 N.E.2d 1190 (1979). Since the passage of the Enforcement of Foreign Judgments Act, Title 10, Ch. 13, Idaho Code, in 1974, and the Uniform Child Custody Jurisdiction Act, Title 5, Ch. 10, in 1977, there is little, if any, justification for resorting to habeas corpus in the realm of child custody.

### II.

This is an instance where it is possible to isolate and delineate the basic issue, an issue which is not today reached by the majority. As is well-stated in one of the leading texts:

"There is a public obligation to provide evidence and this obligation persists no matter how financially burdensome it may be.

"This rule is sometimes embodied in a statute declaring that a witness *must answer questions legal and pertinent to the matter in issue,* . . . . Under such provision *a witness is not bound to answer questions irrelevant to the issue.* . . .

"Generally speaking, a witness possessing knowledge of facts material to the vindication of the rights of another may be compelled by judicial process to appear and give evidence in behalf of that other party . . . ."

81 Am.Jur.2d 52 § 28 (emphasis added). Recently this Court considered a case where a newspaper and its writers were punished for the refusal of the writers to testify. The punishment inflicted there was more severe than that in the confrontation which is before us today. In reversing the trial court we observed that "At no time during the hearing on the motion for sanctions, nor in its supporting memoranda, nor in its argument on appeal, has Sierra shown that its inability to discover the confidential sources obstructed its ability to prove the falsity of the publications. * * * Sierra has not pointed out how revelation of sources would have been instrumental in establishing that the articles were in fact false." *Sierra Life Insurance Co. v. Magic Valley Newspapers,* 101 Idaho 795, 623 P.2d 103 (1981). As that case points out, alleged falsity of certain statements published in the Twin Falls Times-News was a primary issue germane to the controversy. In a separate opinion, Bakes, J., declared that on remand, absent a demonstration " 'how revelation of [the] sources would have been instrumental in establishing that the articles were in fact false,' summary judgment should be entered in favor of the defendants." 101 Idaho at 801, 623 P.2d at 109.

Let us turn to the facts in the pending litigation which led to the punishment of

Ellen Marks, who was not a party thereto, but whose knowledge as to the whereabouts of Alysia and her mother was wanted. The controversy had its genesis in a 1975 Arizona divorce decree wherein Alysia's custody was awarded to her father, with the mother having rights of reasonable visitation. The parties migrated to Nebraska and submitted to the courts of that state minor disputes revolving around visitation.

In 1980, Alysia came to Idaho to visit her mother, who was by then living here. While Alysia was still in Idaho her mother filed papers in the district court of Ada County and at the same time filed papers in the district court of Douglas County, Nebraska—both proceedings aimed at obtaining temporary possession of Alysia. According to the petition for the writ of habeas corpus, the Nebraska court ordered the mother to return the child to the father pending further investigation and evaluation, and authorized the father to pick up Alysia. Paragraph VI. (At the first hearing before Judge Vehlow, counsel for Alysia's father asked Randy Gilmore if he had discussed with his wife "the *pending action* in Nebraska and the custody situation with Alysia." Tr., Vol. I, p. 10.)

It is *alleged* that the 1980 Nebraska order is entitled to full faith and credit, and alleged further that the father does not know the whereabouts of Alysia and her mother. The petition prays that a writ of habeas corpus issue demanding that Alysia's mother, and the mother's husband, bring Alysia before the court so "that the court may make such orders concerning the custody of the said child as will best serve the interests of justice." Prayer of Petition.

A writ was issued to Alysia's mother and to the mother's husband commanding them to bring Alysia before Judge Vehlow at a stated time on September 10, 1980, "to do and receive what shall then and there be considered concerning (Alysia)." A return of service shows that the named respondents were served by Louis W. Chase and Sgt. Gary Thurston by delivering copies of the process to Randall Gilmore (the husband

of Alysia's mother) on September 9, 1980, at his place of employment, Hewlett-Packard. The return recites that Randall Gilmore resided at the same place as Alysia's mother. Judge Vehlow considered this as valid personal service [1] upon Alysia's mother and issued a bench warrant for her failure to appear. Accepting that service so made upon Alysia's mother was sufficient enough to notify her of the issues which would be tried, the mother would be in default after the expiration of twenty days, entitling the court to enter its judgment on the issue presented.

## WHAT WAS THE ISSUE?

The pleaded issue was simply that the 1980 Nebraska order was entitled to full faith and credit. No contention was made that the Arizona decree was entitled to full faith and credit, or that there was any final decree which had been entered by a Nebraska court. Rather and to the contrary there is an intimation that the parties had submitted to the jurisdiction of the Nebraska court. The contention advanced was only that the 1980 Nebraska *order* was entitled to full faith and credit. The resolution of the issue thus presented would appear to be a question of law, *i.e.*, the finality of the Nebraska order entitling it to recognition by an Idaho court under the provision of the full faith and credit clause of the United States Constitution, art. 4, § 1. We recently had before us such an issue in *Mitchell v. Pincock,* 99 Idaho 56, 577 P.2d 343 (1978). In that case a *final decree* of guardianship was entered in California and the enforcement of the decree sought in Idaho. The district court of Ada County reversed a decision of a magistrate of that court extending full faith and credit to the California decree. We in turn agreed with the magistrate and reversed the district court. Although the district court had approached the question as an issue of fact, *i.e.*, the best interests of the child, we were obliged to and did as a matter of law give credence to the United States Constitution,

---

1. Footnote 1 is appended.

once we ascertained the finality of the California decree under California law.

Here, in order to resolve the issue before us, it is not necessary to pass upon the finality of the Nebraska order of 1980. That issue is not before us, and will not be. It is required, however, that we isolate the issue so that we can pass upon the validity of Judge Vehlow's order holding Ellen Marks in contempt of court, and thereafter incarcerating Marks in jail, and thereafter fining her a substantial amount of money. If the questions to which the judge demanded answers were not relevant to the issue before the judge, then the contempt order was invalid, and the fines collected should be returned. The answer is, of course, self-evident and hardly needful of saying. The answers sought were not by any stretch of the imagination germane to the sole issue of law presented. The jail incarceration and fines, undoubtedly aimed at punishing a violation of a direct order by the court to testify, cannot be said to be legally justified where the answers requested were not pertinent to the main issue raised by the petition for the writ. Hence, the order was in error. *Had* the habeas gone to judgment in favor of Alysia's father, *and had* Judge Vehlow found the Nebraska order entitled to full faith and credit, *and had* Judge Vehlow ordered Alysia's surrender by her mother, then there *might* have been some validity to an order directing Ellen Marks to answer the questions if propounded by the court in furtherance of supplemental proceedings enforcing its order—a question which need not be answered. A procedure is available which would appear to be far more appropriate, referring to the Uniform Child Custody Jurisdiction Act, which had not been enacted at the time of *Mitchell v. Pincock,* and referring also to I.C. §§ 18–4501(2) and 18–205.

### III.

The majority, while expressing its approval of the language which it quotes from *Zerilli v. Smith,* 656 F.2d 705 (D.C.Cir.1981), nevertheless concocts "the sanctity-safety exception"—predicated upon the "safety" of a child not alleged nor shown to be in any way endangered and the "sanctity" of a writ which is being inappropriately utilized. Were the Court today required to decide the issue on wholly constitutional issues— which it clearly is not—while inclined to adopt the *Zerilli* language, I would not look so far afield for persuasive authority. Our neighboring sister state of Washington has considered the issue just this very year in *Clampitt v. Thurston County,* 98 Wash.2d 638, 658 P.2d 641 (1983), wherein the issue before the Washington Supreme Court was that of a reporter's privilege raised where the reporter, as here, refused to answer questions propounded to him. The case thus bears similarity to both our *Sierra* case and the case before us.

In *Clampitt,* a nine-member court dealt in depth with the issue. Its opinion is available and one would think should be persuasive with today's majority, where the *Clampitt* court relies on the same *Zerilli* opinion which today's majority approves. It is readily ascertainable that the Washington court is of the view that in civil cases, at least, reporters will be accorded a common law privilege against compelled disclosure. The privilege is not absolute and the Washington court holds that "The party seeking discovery may defeat the privilege by showing that (1) his or her claim is meritorious; (2) the information sought is critical to that claim; and (3) he or she has made a reasonable effort to obtain the information by other means." 658 P.2d at 644. This holding, especially as to (1) and (2), bears a striking similarity to our holding in *Sierra Life.* As *Clampitt* makes evident, and as petitioners here claim, trial courts cannot simply declare, as did respondent in this case, "that no such claimed privilege existed." This would seem especially true where, as petitioner correctly claims here, that issue had not been joined between the parties to the litigation, and hence there was nothing before the court. But, even if there was something before the court, petitioner was entitled to a proper hearing—which here was not accorded to her.

 

## APPENDIX
### Footnote 1

The bench warrant recites:

"Eugenia A. Clary Gilmore, having been served through her husband, Randall Gilmore, with a Petition for Writ of Habeas Corpus on September 9, 1980 requiring her to appear on September 10, 1980 at 4:00 p.m. at the Ada County Courthouse, Boise, Idaho, in person, and to produce Alysia Danielle Clary at said hearing, and said defendant-respondent, Eugenia A. Clary Gilmore, having failed to appear on September 10, 1980 at 4:00 p.m. before this Court in person and/or with the said child, Alysia Danielle Clary."

The Court's rule 4(d)(2) provides that service of process is "by delivering a copy of the summons and complaint ... personally or by leaving copies thereof at his dwelling house or usual place of abode with some person over the age of eighteen (18) years then residing therein or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process." The Court long ago held that child custody habeas is a civil proceeding. *Mabbett v. Mabbett*, 34 Idaho 611, 202 P. 1057 (1921). There is little difference between the Court's rule in civil proceedings and the provisions attendant to service of writs of habeas corpus. I.C. § 19–4206 provides:

"If the writ is directed to the sheriff or other ministerial officer of the court, out of which it issues, it must be delivered by the clerk to such officer without delay, as other writs are delivered for service. If it is directed to any other person, it must be delivered to the sheriff, and be by him served upon such person by delivering the same to him without delay. If the person to whom the writ is directed cannot be found, or refuses admittance to the officer or person serving or delivering such writ, it may be served or delivered by leaving it at the residence of the person to whom it is directed, or by affixing it to some conspicuous place on the outside, either of his dwelling-house or of the place where the party is confined or under restraint."