803 P.2d 528

**The STATE of Idaho, Plaintiff–Respondent,**

v.

**Linda MISSAMORE, Defendant–Appellant.**

**No. 18179.**

Supreme Court of Idaho, Boise, October 1989 Term.

Dec. 21, 1990.

Dan J. Rude, Coeur d'Alene, for defendant-appellant.

Jim Jones, Atty. Gen. and John J. McMahon, Chief Deputy Atty. Gen., Boise, argued, for plaintiff-respondent.

1990 OPINION NO. 51, FILED APRIL 24, 1990, IS HEREBY WITHDRAWN AND THIS OPINION IS SUBSTITUTED THEREFOR.

McDEVITT, Justice.

This is an appeal from a trespassing conviction and sentence that has been affirmed by the district court and the Court of Appeals on the grounds that disputed testimony was properly admitted and that the sentence was proper and constitutionally valid.

## FACTS

This is a case of a legal loose thread that when pulled never seemed to stop unraveling. On the evening of May 31, 1986, Linda Missamore took her dog for a walk along Hauser Lake Road. As they headed into what had to be a typically beautiful Idaho sunset, they came upon the home of Mr. and Mrs. Schmidt. The Schmidts' front lawn is contiguous with Hauser Lake Road. There is a strip of lawn approximately ten feet wide that lies between the gravel shoulder of Hauser Lake Road and the Schmidts' property line. There is no fence or line of demarkation between this strip of lawn and the Schmidts' front lawn.

When Missamore and her companion reached the Schmidts' home they apparently stopped; the reason is undisclosed. The Schmidts could see Missamore and her dog through their front window. Mrs. Schmidt believed Missamore was on their property so she walked out and asked Missamore to leave. Missamore said that she was on county property and therefore did not have to leave. The Schmidts asked Missamore to leave a number of times; each time Missamore refused. After the last refusal,

Mrs. Schmidt walked back into the house and called the sheriff. At this point, Missamore left the area.

On June 4, 1986, Missamore was charged in a SWORN COMPLAINT FOR TRESPASSING in violation of I.C. § 18-7011. Missamore elected to assert her right to a jury trial. At the beginning of the trial, the State amended the complaint and went forward under I.C. § 18-7008(8).[1]

At trial, the prosecutor asked Mr. Schmidt why *he* had asked Missamore to leave the property. Schmidt responded over defense counsel's objection that, "She had no reason to come up there with her dog that I could see. She was just harassing." Brian Sprague, a neighbor of the Schmidts', testified over defense counsel's objection that problems existed between the Schmidts and Missamore. In addition to these colloquies, defense counsel objected to numerous other questions and answers during the State's case in chief.

At the conclusion of the trial the trial judge instructed the jury on trespassing as per I.C. § 18-7008(8). The jury found Missamore guilty.

On January 28, 1987, the trial judge sentenced Missamore for an I.C. § 18-7011 violation, the misdemeanor that Missamore was initially charged with but not the one upon which the jury was instructed and she was convicted.[2] Missamore received thirty days in jail, with all but five suspended, unsupervised probation for two years and a $100 fine. Prior to imposing the sentence, the court received testimony from Mrs. Schmidt who alleged that Missamore had attempted to harass her following the trial. Missamore takes exception to the admittance of this testimony as well as testimo-

---

1. I.C. § 18-7011. Criminal trespass, a misdemeanor to go upon enclosed land of another. I.C. § 18-7008(8). Trespass defined as including being verbally notified by owner to depart; refusal to comply.
   I.C. § 18-113. When no specific punishment is provided for a specific misdemeanor, the punishment county jail imprisonment not exceeding six months or by a fine not exceeding $300.00, or both.

2. Although under different circumstances the trial judge's sentencing under the wrong statu-

tory provision could certainly be detrimental to the validity of the sentence, such discrepancy is inconsequential in this case. This is because the sentencing scheme under I.C. § 18-7011 is identical to the sentencing scheme under I.C. §§ 18-7008(8) and 18-113. I.C. § 18-7008(8) does not include any sentencing provisions. Accordingly, one who violates this code section will be sentenced under I.C. § 18-113 which provides a sentencing schemata that is identical to that of I.C. § 18-7011.

ny elicited during the presentation of the State's case.

After being sentenced, Missamore appealed to the district court claiming that the trial court admitted improper testimony, imposed too severe a sentence and erred in not instructing the jury on mistake of fact as a possible defense. The district court affirmed the magistrate. Missamore then appealed to the Idaho Court of Appeals which affirmed the sentence and conviction. Missamore now appeals to this Court and asks us to rule that:

1. The trial court committed reversible error in allowing improper evidence into the record, thereby justifying reversal of the conviction and a new trial;

2. The trial court erred in refusing to instruct the jury on mistake of fact as a defense; and

3. The Misdemeanor Criminal Rules sentencing guidelines deprived Missamore of her right to equal protection and the severity of Missamore's sentence was the result of her exercising her constitutional right to a jury trial.

## I.

Missamore argues that the trial court committed three specific evidentiary errors that provide grounds for reversal. Each assignment has been properly preserved for appeal.

■ Missamore first argues that Mr. Schmidt's testimony that he asked Missamore to leave the Schmidts' property at the time of the incident in question constitutes evidence of another crime not charged. We disagree. Mr. Schmidt's testimony went to the incident in question and was therefore relevant. An additional crime does not arise out of a single transaction with each additional eyewitness to that transaction.

■ Missamore next argues that the trial court erred in allowing into evidence a series of questions and answers between the prosecutor and Mr. Schmidt regarding why Mr. Schmidt asked Missamore to leave his property. Missamore claims that this dialogue was not relevant, and that

Schmidt's responses were conclusory and based on an impermissible opinion concerning Missamore's state of mind.

■ Idaho Code § 18–7008(8) does not require that the owner of private property have any reason for asking trespassers to get off their land. It merely requires that the owner or authorized agent notify the transgressors that they are on private land and must leave. Persons so notified and capable of leaving must then leave. Because the owner is not required to have any reason for asking the trespasser to depart the owner's land, the prosecutor's question of why Mr. Schmidt asked Missamore to get off his land was irrelevant.

■ However, the question did open the door for Mr. Schmidt to answer that "she was just harassing." This answer was prejudicial to Missamore. The question is whether it was sufficiently prejudicial to warrant reversal.

Whether Mr. Schmidt's response was relevant depends upon whether or not intent is an element of an I.C. § 18–7008(8) violation. Idaho Code § 18–7008(8) requires that, "[e]very person who *willfully* commits any trespass, by ... (8) ... being first notified in writing, or verbally by the owner or authorized agent of the owner of real property, to immediately depart from the same and who refuses...." Idaho Code § 18–101(1), states "[t]he word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage."

■ For any act to constitute a trespass under I.C. § 18–7008(8), it must be done willfully. This means that the defendant's "intent to violate law, or to injure another, or to acquire any advantage ..." is irrelevant. Thus, Mr. Schmidt's response that Missamore was on the Schmidt property to harass the Schmidts was irrelevant and should have been stricken from the record.

■ While Mr. Schmidt's statement was irrelevant, it was also an improper statement of a lay witness's opinion under Idaho Rule of Evidence 701 and therefore, the trial court abused its discretion in admitting it. Generally, a trial court may allow a lay witness to state an opinion about a matter of fact within his or her knowledge, as long as two conditions are met. First, the witness's opinion must be based on his or her perception; and second, the opinion must be helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. I.R.E. 701; *accord State v. Rosencrantz*, 110 Idaho 124, 714 P.2d 93 (Ct.App.1986). The admissibility of such testimony turns upon its underlying factual basis, not the fact that it is in the format of an opinion. *See* Report of the Idaho State Bar Evidence Committee, comments to I.R.E. 701 at 4 (1983 and 1985 Supp.).

■ In this case, the admission of Schmidt's statement did not fulfill the I.R.E. 701 requirements. There is no basis for an opinion as to the motives of Missamore by Schmidt based on his observation. In addition to being irrelevant and improper, Schmidt's statement that Missamore was there just to harass the Schmidts was clearly prejudicial.

Subsequent exchanges between the prosecutor and Mr. Schmidt, as well as another witness for the prosecution, Brian Sprague, compounded the existing fracture between relevant evidence and irrelevant prejudicial evidence. Immediately after the exchange discussed above, the prosecutor asked Mr. Schmidt, "All right, would you ... say she came on just to harass you?" Mr. Schmidt stated, "In the past, she's drove in our driveway with her truck." Moments later Mr. Schmidt testified that in the past, "[w]ell, she's ... driven across the lawn...." Later, the prosecutor asked Brian Sprague, "[l]et me see, Brian, from what you know ... do you know why the defendant walked onto the Schmidts' property?" To which Sprague replied, "Harassment. It's been going on for a long time...."

■ "[T]o hold an error as harmless, an appellate court must declare a belief, beyond a reasonable doubt, that there was no reasonable possibility that such evidence complained of contributed to the conviction." *State v. Sharp*, 101 Idaho 498, 507, 616 P.2d 1034, 1043 (1980). Where the admissible evidence provides, beyond a reasonable doubt, "overwhelming and conclusive" proof of a defendant's guilt, the admission of tainted evidence will be held to be harmless error." *State v. LePage*, 102 Idaho 387, 395, 630 P.2d 674, 682 (1981). "Harmless error" refers to technical errors, which do not require reversal.... "Cumulative error" refers to a number of errors which prejudice defendant's right to a fair trial. *State v. McKenzie*, 186 Mont. 481, 514, 608 P.2d 428, 448, *cert. denied*, 449 U.S. 1050, 101 S.Ct. 626, 66 L.Ed.2d 507 (1980). "Under the cumulative error doctrine, an accumulation of irregularities, each of which in itself might be harmless, may in the aggregate show the absence of fair trial." *State v. Campbell*, 104 Idaho 705, 719, 662 P.2d 1149, 1163 (Ct.App.1983).

In sum, the prosecutor's questions and Schmidt's and Sprague's answers described above, were irrelevant. Schmidt's and Sprague's answers constituted impermissible opinions. Because of this, we must hold, based on this record, that we are left with a reasonable doubt that the jury would have reached the same result had the error not occurred.

BISTLINE and JOHNSON, JJ., concur.

BAKES, C.J., and BOYLE, J., dissent.

## II.

■ We affirm the trial court's ruling that the jury should not have been instructed on mistake of fact as a defense. All that is required for an I.C. § 18–7008(8) violation is that the defendant refuse to leave property that belongs to another after being so requested by the owner or authorized agent. Unless the defendant is incapable of leaving or has one of the other recognized excuses for "trespassing," *e.g.*

emergency, his or her refusal to leave constitutes trespass.

BAKES, C.J., and BISTLINE, JOHNSON and BOYLE, JJ., concur.

### III.

Missamore's third argument has two parts. First, Missamore argues that her right to equal protection was violated in that if she had been charged by Uniform Citation rather than Complaint she would have been exposed to a lesser sentence. Second, she argues that the sentence she received was greater than what might have been imposed had she pled guilty, and that the sentence therefore improperly punished the exercise of the right to jury trial. We address each argument in turn.

### A.

The sentencing scheme for an I.C. § 18–7008(8) violation is set forth in I.C. § 18–113. The maximum sentence under this section is $300.00 and six (6) months in jail. However, where the defendant has been charged by Uniform Citation rather than Complaint a different sentencing limitation may be imposed. In that case, if the amount of bail set for the offense does not exceed $70.00, the defendant may plead guilty, pay a fine in the amount set for bail, and go free. *See* Misdemeanor Criminal Rules 13(a), 14(a), and 14(b)(4).

The essence of Missamore's argument is that if she had been charged by Uniform Citation her maximum punishment for a guilty plea would have been $50.00 or less, because the magistrate had set her bail at $50.00. Instead, because she was charged by Complaint, her maximum punishment could have been $300.00 and six (6) months in jail, regardless of whether she pled guilty or was found guilty by the jury. Missamore claims that it is the discrimination created by the different sentencing schemes that deprived her of equal protection of the laws.

The equal protection clause of the Fourteenth Amendment is designed to ensure that those persons similarly situated with respect to a governmental action should be treated similarly. *State v. Hayes*, 108 Idaho 556, 700 P.2d 959 (Ct. App.1985), *rev. denied*. In an equal protection challenge, the first step is to identify the challenged classification. The court must then determine the standard of review to be applied and whether that standard has been satisfied. *Tarbox v. Tax Commission*, 107 Idaho 957, 695 P.2d 342 (1984).

A classification must be reviewed with strict scrutiny where the distinction is based upon a suspect classification, such as nationality, *Oyama v. California*, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948); race, *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944); or, where "fundamental rights" are involved; *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973). The strict scrutiny standard of review requires that the State bear the burden of proving not only that it has a compelling interest which justifies the classification but also that the discrimination is necessary to promote that interest. *Thompson v. Hagan*, 96 Idaho 19, 523 P.2d 1365 (1974); *Newlan v. State*, 96 Idaho 711, 535 P.2d 1348 (1975).

Where the distinction is not based upon a suspect classification and does not implicate fundamental rights, the rational basis standard of review is utilized. This standard merely requires proof that there is a rational basis for the classification which would further a legitimate state objective. *Tarbox v. Tax Commission*, 107 Idaho 957, 695 P.2d 342 (1984).

An intermediate standard is the "means focus" test, where the court must ask "whether the legislative means substantially furthers some specifically identifiable legislative end." *Jones v. State Board of Medicine*, 97 Idaho 859, 867, 555 P.2d 399, 407 (1976). This test is applicable when the State action in question creates obviously and invidiously discriminatory classifications. *Id.*

In this case the classification challenged under the equal protection clause is

the fact that persons who are alleged to have violated the same statute may be subject to disparate treatment according to the form of the document by which they are charged. One class consists of misdemeanant who, charged by Complaint, may be sentenced up to six (6) months in jail and fined up to $300.00 whether they plead guilty or are found guilty by a jury. The other class consists of misdemeanant who, charged by Uniform Citation (and providing that bail is set in an amount less than $70.01), may plead guilty and be sentenced a maximum of $70.00 with no risk of jail sentence. Having determined that the Misdemeanor Criminal Rules create two classes, we now address the applicable standard of review.

■ Missamore does not allege, nor does it appear, that the different treatment accorded to misdemeanant under the current system is based upon a suspect classification. It is also apparent that fundamental rights are not implicated by the dual charging system. The issue under the facts of this case is whether the curtailment of liberty through the possibility of a jail sentence, or deprivation of property through the imposition of a fine under the authority of criminal sentencing procedures amounts to the deprivation of a "fundamental right." The test of whether any particular right is fundamental "lies in assessing whether there is a right ... explicitly or implicitly guaranteed by the Constitution." *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. at 33, 93 S.Ct. at 1297, 36 L.Ed.2d 16 (1973).

■ The Constitution protects liberty and property only to the extent that it may not be deprived "without due process of law." U.S. Const. amend. V. Once properly convicted, a criminal defendant has been afforded due process, and the defendant's liberty and property are then subject to the criminal sentencing laws of the state. As long as those laws are applied in a manner consistent with constitutional guarantees, the deprivation of liberty and property are properly within the power of the state.

Thus, we conclude that fundamental rights are not implicated in this case.

There is no obvious and invidious discrimination alleged that would require the intermediate "means-focus" analysis; therefore, the proper standard of review to be applied is whether there is a rational basis for the criminal sentencing procedures at issue.

■ The State asserts that the rational basis underlying the Citation or Complaint charging option is the preservation of court resources through a simplified guilty plea and fine procedure in less serious misdemeanor cases. However, finding that a particular rational purpose is served by the challenged classification does not end our inquiry. The asserted purpose of a challenged provision must itself be legitimate in order to serve as a valid defense to an equal protection challenge. *See Shapiro v. Thompson*, 394 U.S. 618, 630–34, 89 S.Ct. 1322, 1328–30, 22 L.Ed.2d 600 (1969).

■ The decision of whether to charge a defendant by means of Citation or Complaint is a matter of prosecutorial discretion. In *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962), the United States Supreme Court addressed the propriety of the exercise of prosecutorial discretion in the context of the equal protection clause. The Court stated:

[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore grounds supporting a finding of denial of equal protection were not alleged.

*Oyler v. Boles*, 368 U.S. at 456, 82 S.Ct. at 506. *See also United States v. Batchelder*, 442 U.S. 114, 124–25, 99 S.Ct. 2198, 2205 n. 9, 60 L.Ed.2d 755 (1979); *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668–69, 54 L.Ed.2d 604 (1978); *United States v. Duncan*, 598 F.2d 839, 869 (4th Cir.1979); *U.S. v. Aleman*, 609 F.2d 298, 305–06 (7th Cir.1979).

Missamore cites *In re Mallon*, 16 Idaho 737, 102 P. 374 (1909), in support of the

argument that different persons charged with the same offenses may not be subjected to different punishments without violating equal protection. The statute at issue in that case provided for a mandatory doubling of the sentence being served as punishment for attempted escapes from prison, and gave the sentencing authority no discretion to tailor the sentence. This Court invalidated the statute under the equal protection clause, because the same act of escape by two different prisoners could result in widely disparate sentences without regard to the surrounding circumstances. The Court stated that:

> While the legislature, in prescribing and fixing punishment for the crime, has very great latitude in classifying the same, still the rule is well recognized, that in making such classification it should be natural and not arbitrary, and should be made with reference to the heinousness and gravity of the act or acts made a crime, and not with matters disconnected with the crime.

*In re Mallon,* 16 Idaho at 745, 102 P. 374. *See also Ex parte Knapp,* 73 Idaho 505, 254 P.2d 411 (1953).

The rule of *Mallon* does not serve to invalidate the misdemeanor sentencing provisions at issue here. The decision of how to charge a misdemeanant, which ultimately affects the range of possible sentences, is not made without reference to the circumstances of the prohibited act, as was the case in *Mallon.* The arresting officer and/or prosecutor initially determines by what means to charge the individual based upon the circumstances of the crime. For example, a person arrested for the second time of Driving Under the Influence is more likely to be charged by Complaint, thus requiring a court appearance and enhancing the possible sentence, than a first time offender in illegal possession of one trout over the bag limit.

Even if charged by Citation, whether the defendant should be entitled to plead guilty and pay a fine is further evaluated through the Misdemeanor Criminal Rules' assessment of the seriousness of various types of misdemeanors by means of the misdemeanor bail schedule contained in M.C.R. 13. Any misdemeanor for which bail is set in an amount greater than $70.00, regardless of the manner in which the crime is charged, precludes the opportunity to plead guilty and pay a fine. Thus, under the M.C.R. bail schedule, if the D.U.I. case and the possession of unlawfully taken trout case are both charged by Citation, the D.U.I. defendant is not eligible to plead guilty and pay a fine, while the fish and game offender may. In addition, the option to plead guilty and pay the fine is further curtailed if the case of the fish and game offender is reviewed by a judge or magistrate who, in evaluating the seriousness of the offense, chooses to ignore the bail schedule and set bail in an amount greater than $70.00. M.C.R. 13.

Thus, the availability of the guilty plea and fine option will depend on the determination as to the seriousness of the offense at several levels during the course of the prosecution, and it cannot be said that the decision of whether to charge by Citation or Complaint is arbitrary or made without reference to the heinousness and gravity of the crime.

Therefore, we conclude that the dual charging system employed in misdemeanor cases is not a violation of equal protection.

**B.**

We now address Missamore's final argument that the sentence violated her right to jury trial. Missamore reasons that because the sentence she received was greater than what she would have received had she pled guilty, the sentence was punishment for exercising her right to a jury trial and constituted an impermissible burden on that right. We cannot accept this argument.

Since Missamore was charged by a signed Complaint, the punishment she received was no more serious than what she could have received had she pled guilty. Since she was not charged by Uniform Citation, she did not have the choice of either pleading guilty and paying a $50.00 fine or going to trial and risking a more severe sentence. Because this choice was

not presented to her, she has no standing to raise the issue that the Misdemeanor Criminal Rules sentencing scheme violated her right to jury trial. Because she has no standing to raise the issue, it is not ripe for our review.

■ However, for the purpose of guiding the trial court on remand, we must address the issue of whether the applicable Misdemeanor Criminal Rules sentencing guidelines infringe upon a defendant's constitutional right to a jury trial to the extent that, in certain situations, they allow for greater punishment upon a finding of guilt by jury than upon guilty by plea. We hold that the Misdemeanor Criminal Rules' sentencing guidelines do not so infringe upon the right to a jury trial.

In *Corbitt v. New Jersey*, 439 U.S. 212, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978), the United States Supreme Court held that New Jersey's statutory sentencing scheme, whereby a life sentence is mandatory upon a jury conviction for first degree murder, but a lesser sentence is permissible upon acceptance of the defendant's plea of nun vult or nolo contendere, was constitutionally permissible. The Court stated:

> Specifically, there is no per se rule against encouraging guilty pleas. We have squarely held that a State may encourage a guilty plea by offering substantial benefits in return for the plea. The plea may obtain for the defendant not only "the possibility or certainty ... [of] a lesser penalty than the sentence that could be imposed after a trial and a verdict of guilty ...," but also of a lesser penalty than that *required* to be imposed after a guilty verdict by a jury.

*Id.* at 218–20, 99 S.Ct. at 497–98 (footnotes and citations omitted, emphasis original).

While this Court has often construed the right to a jury trial under Article 1, § 8 of the Idaho Constitution as being more generous than the same right as guaranteed by the United States Constitution and as interpreted by the United States Supreme Court, in this instance the *Corbitt* holding is applicable.

BAKES, C.J., and JOHNSON and BOYLE, JJ., concur.

BISTLINE, J., dissents.

Reversed and remanded for new trial as per this opinion. No costs or attorney fees.

BAKES, Chief Justice, dissenting as to Part I:

I respectfully dissent as to Part I of the Court's opinion. I believe the courts below correctly sustained the conviction and sentence of the appellant Missamore. Specifically, as to Part I, I believe the Court errs when it concludes that because evidence of harassment is not an element of the crime of trespass under I.C. § 18-7008(8), that evidence of the defendant's intent to harass is not relevant. Furthermore, I believe the Court of Appeals was correct in concluding that the trial court did not abuse its discretion in permitting opinion evidence that the defendant Missamore was harassing the complainants.

The facts related in the majority opinion need some amplification. When evaluating the evidence on appeal, "the reviewing court will review the evidence in a light most favorable to the respondent." *Higginson v. Westergard*, 100 Idaho 687, 698, 604 P.2d 51, 52 (1979); *Glenn Dick Equipment Co. v. Galey Constr. Co., Inc.*, 97 Idaho 216, 541 P.2d 1184 (1975). However, the majority opinion has related the facts primarily from the appellant Missamore's point of view, contrary to our cases. When viewed most favorably to the Schmidts, a different picture unfolds. At trial the Schmidts testified that the appellant Missamore walked across the 10-foot wide strip that lies between the gravel shoulder of Hauser Road and the Schmidts' property line and then continued several feet onto the Schmidts' property. After refusing to leave after being requested to do so several times, the Schmidts called the sheriff. The Schmidts testified that Missamore had done this several times before, and on one occasion Missamore had driven her truck across the Schmidts' lawn. Although the appellant Missamore denied at trial that she had trespassed onto the Schmidts' property, the

jury resolved that issue against Missamore, and found her guilty as charged.

On appeal the appellant Missamore has not raised any issue regarding the sufficiency of the evidence to sustain the jury's finding that she trespassed onto the Schmidts' property and refused to leave after demand was made upon her by the Schmidts. Accordingly, we are bound by the jury's finding that Missamore did trespass onto the Schmidts' property and did refuse to leave when requested to do so by the Schmidts. I.A.R. 35; *Cline v. Roemer,* 97 Idaho 666, 668, 551 P.2d 621, 623 (1976); *Haggerty v. Western Barge, Inc.,* 94 Idaho 509, 492 P.2d 48 (1971); *Oregon Shortline Ry. Co. v. City of Chubbuck,* 93 Idaho 815, 474 P.2d 244 (1970).

## I

### *Evidentiary Issues*

A. Both Mr. and Mrs. Schmidt, together with the neighbor Mr. Sprague, were permitted by the trial court to testify, in the course of describing what the defendant Missamore had done, that Missamore "was just harassing" and that the harassment had been going on for a long time. The majority opinion acknowledges that in order to obtain a conviction under I.C. § 18–7008(8) the trespass must be done "willfully."[3] The Court then quotes the definition of "willfully" from I.C. § 18–101(1), which states that "[t]he word 'willfully', when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage." *Ante* at 31, 803 P.2d at 532. The Court then concludes that "this means that the defendant's 'intent to violate the law, or to injure another, or to acquire any advantage ...' is irrelevant. ... Mr. Schmidt's response that Missamore was on Schmidt's property to harass the Schmidts was irrelevant...." *Ante* at 31, 803 P.2d at 532.

While proof of an intent to harass is not an element of the crime of trespass under I.C. § 18–1008(8), it certainly does not follow that proof of intent to harass is irrelevant in a criminal prosecution under that section. The defendant Missamore pled not guilty to the allegation in the criminal complaint which alleged that she had trespassed onto the Schmidts' property and refused to depart when requested by the Schmidts. I.C. § 18–7008(8) requires that the trespass be committed "willfully." Thus, evidence that the defendant Missamore had previously been harassing the Schmidts by prior trespasses would be extremely relevant evidence for the jury to resolve the factual dispute raised by the defendant Missamore's denial that she had trespassed onto the Schmidts' property on the occasion charged in the criminal complaint. Under Idaho Rule of Evidence 401, "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 404(b) specifically permits the admission of evidence of other prior acts of trespass for the purpose of showing motive, in this case the defendant Missamore's intent to harass. It is difficult to understand how the Court can conclude that a criminal defendant's motive in committing a crime can be irrelevant. For example, in a murder prosecution, evidence of a motive for the murder—for example, revenge—is not an element of the crime under the statute, but evidence of the motive of revenge would certainly be relevant evidence. Intent to harass may not be an element of the crime of trespass under I.C. § 18–7008(8); however, the defendant Missamore's motive for committing the crime, *i.e.,* to harass the Schmidts, is certainly relevant. Additionally, Missamore testified that when she was ordered off the property by the Schmidts she responded, " 'Well

---

**3.** I.C. § 18–7008(8) requires that "[e]very person who *willfully* commits any trespass, by ... (8) ... being first notified in writing, or verbally by the owner or authorized agent of the owner of real property to immediately depart from the same and who refuses ..." is guilty of trespass. (Emphasis added.)

isn't this' ... I go, 'Isn't this county road?'" Evidence of an intent to harass was therefore relevant to show that the defendant Missamore was not on the Schmidts' property as the result of "mistake or accident." I.R.E. 404(b). I believe the Court commits serious error when it concludes that evidence of Missamore's intent to harass is irrelevant. It was relevant both for showing a motive and for showing lack of "mistake or accident."

Our cases have consistently held that the determination of relevance is vested in the sound discretion of the trial court, and that this Court will not reverse the trial court's rulings on evidence absent a showing of a manifest abuse of that discretion. *Marks v. Vehlow,* 105 Idaho 560, 569, n. 9, 671 P.2d 473, 482, n. 9 (1983) ("Relevancy and materiality are to be determined by the trial court.... The determination is vested in the trial court's discretion. Absent an abuse of that discretion, we will not disturb its determination."); *State v. Tierney,* 109 Idaho 474, 708 P.2d 879 (1985); *State v. Terry,* 98 Idaho 285, 561 P.2d 1318 (1977). The trial court did not abuse its discretion in ruling that evidence of harassment was relevant and admissible. *Sun Valley Shopping Center, Inc. v. Idaho Power Co.,* 119 Idaho 87, 803 P.2d 993*.

B. The question of the competence of the witnesses to testify that the defendant Missamore was harassing them is another matter. That is a much closer question and may have influenced this Court's determination that the evidence of harassment was irrelevant. As the Court's opinion points out, under I.R.E. 701 a lay witness may render an opinion if an adequate foundation is laid, and if the opinion is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." Again, the decision to permit a lay witness to express an opinion rests in the discretion of the trial judge who presides over the trial and is in a much better position to judge the impact of such testimony than this Court on appeal. *Stod-*

*dard v. Nelson,* 99 Idaho 293, 297, 581 P.2d 339, 343 (1978) ("Admissibility of expert opinion testimony is discretionary with the trial court and will not be disturbed absent a showing of an abuse of discretion."); *Hansen v. Skate Ranch, Inc.,* 641 P.2d 517, 522 (N.M.Ct.App.1982) ("[T]he admissibility of lay opinion testimony is within the discretion of the trial court and an appellate court will not overturn the decision of the trial court absent an abuse of discretion."); *Egede–Nissen v. Crystal Mountain, Inc.,* 93 Wash.2d 127, 606 P.2d 1214, 1221 (1980) ("The trial court has discretion in ruling on objections based on the [lay] opinion rule, subject to review for abuse of discretion.").

In this case there was substantial evidence from several witnesses that the defendant Missamore had trespassed on the Schmidts' property many times, including driving her truck across their lawn. The Schmidts testified that they had repeatedly requested the defendant Missamore to stay off their property, and she had argumentatively refused. With that foundation, the trial court permitted the lay witnesses to express their opinion that Missamore was harassing the Schmidts. The Court of Appeals, in its opinion in this case addressing this issue, recognized "that a witness may testify as to the state of mind of another person." *State v. Rosencrantz,* 110 Idaho 124, 714 P.2d 93 (Ct.App.1986). The Court of Appeals correctly concluded that "absent an abuse of discretion the decision of the trial court to admit opinion evidence will not be disturbed on appeal. *State v. Curry,* 103 Idaho 332, 647 P.2d 788 (Ct. App.1982)." The Court of Appeals then recognized that "the testimony of both Schmidt and Sprague was based upon their perceptions of the events leading up to the trespassing incident. Schmidt's testimony, that Missamore was 'harassing' him and his wife, was predicated upon his prior dealings with the defendant, and by the fact that, when asked to leave his property, Missamore refused. Likewise, Sprague's testimony at trial was founded on his perception of hostility between Missamore and the Schmidts." Court of Appeals opinion

---

* Editor's Note: The cited opinion, filed January 2, 1991, superseded an opinion filed August 8, 1991. At the request of the Court, the later citation is used.

at pp. 3–4. Based upon that analysis, the Court of Appeals concluded that the trial court had not abused its discretion in permitting the opinion testimony by the lay witnesses as permitted by I.R.E. 701. I believe the Court of Appeals correctly analyzed the law to be applied to this case.

It is an appellant's duty to show error in the trial of a case, and no error will be presumed on appeal. *Carpenter v. Double R Cattle Co., Inc.*, 108 Idaho 602, 604, 701 P.2d 222, 224 (1985) ("The appellants have the burden of showing reversible error on appeal. Error cannot be presumed on appeal, but requires an affirmative showing."); *Gaither v. EG & G Idaho, Inc.*, 106 Idaho 675, 682 P.2d 628 (1984). Not only has the appellant not shown any error in the evidentiary rulings of the trial court, the record demonstrates that the trial court properly exercised its discretion in its evidentiary rulings, and the trial court should be affirmed.

BOYLE, J., concurs in Chief Justice BAKES' dissent as to Part I.

BISTLINE, Justice, concurring and dissenting.

The opinion of Justice McDevitt is eloquent, and would command my whole-hearted concurrence other than that the dual charging, trying, and sentencing scheme in my present view has all of the aspects of an equal protection violation. I concur in the result in Part I of the majority opinion, but am unable to concur in Part III.

Presently I am also unable to comprehend why a directive goes to the trial court to not allow testimony concerning defendant's motive at the second trial, while at the same time instructing that the dual scheme (*i.e.*, charge by complaint or citation) is available in order for prosecutors to take motive into account, and fashion the penalty to the gravity of the crime. In short, it seems to this one member of the Court that misdemeanor trespass, noninjurious, is the most simple of crimes which accordingly should on conviction subject all defendants to the same simple and uniform penalty, without consideration of motive.

To my knowledge this unique holding is unparalleled in the history of Idaho jurisprudence, or elsewhere insofar as can be ascertained.

## I. THERE IS NO RATIONAL BASIS FOR THE DUAL SENTENCING SCHEME

The majority correctly states that "[t]he equal protection clause of the fourteenth amendment is designed to ensure that those persons similarly situated with respect to a governmental action should be treated similarly. *State v. Hayes*, 108 Idaho 556, 700 P.2d 959 (Ct.App. *review denied* 1985)." The majority impliedly recognizes that the dual sentencing scheme violates equal protection because the majority proceeds to evaluate whether the scheme may nevertheless pass constitutional muster by surviving the rational basis test.

The majority finds that the dual sentencing scheme passes the rational basis test because the prosecutor determines which route to take according to the "heinousness and gravity" of the trespass. This argument fails for two reasons. Because the motive of the trespasser is not an element of the crime, a prosecutor would be way off base if he did in fact allow himself to be guided by the supposed heinousness of the trespass. The crime of trespass for which one may be punished under I.C. § 18–7008(8) encompasses only the refusal to depart the property of another after being asked to leave. A conviction for the crime requires only that the person asked to leave does not leave, or responds that he will not leave; not at all involved in the crime is the intent that the trespasser has in mind, if any, and particularly where that intent flows from the subjective belief of the trespassee that the trespasser's intention is harassment.

It has been said that a simple trespass is a crime of general intent. Moreover, prosecutors may have some say as to which charging scheme should be utilized. But if so, it seems to be only by prosecutorial fiat rather than by court rule or legislative statute. In any event the decision is not

necessarily made on a rational rather than an arbitrary basis, and may likely be whimsical or, as here, where the police became involved based on hearing only one side of the controversy.

The majority deems that "[t]he decision of whether to charge a defendant by means of Citation or Complaint is a matter of prosecutorial discretion." Presently, I do not agree. Any person, and that means not just prosecuting attorneys, can swear out a Complaint. In fact, in *this* case the Schmidts were the complaining parties; they swore out the Complaint, thus proving the point. R., 3. The statutory law of Idaho for over a hundred years has provided that anyone can go before a magistrate and swear out a complaint, I.C. § 19–3901, and that complaint will result in the named defendant's arrest. I.C. § 19–3903. Any involvement by the county prosecutor at that stage is questionable, other than that a magistrate after hearing the complainants can decide whether the facts present an indicia of crime, and therefrom reach a conclusion as to what is the apparent nature of the conduct, and where it is criminal, identify the crime, and ask the prosecuting attorney to draw a complaint accordingly.

## II.  MISDEMEANORS ARE SIMPLE CRIMES

The majority attempts to side-step Idaho precedent with this statement:

> The rule in *Mallon* does not serve to invalidate the misdemeanor sentencing provisions at issue here. The decision of how to charge a misdemeanant, which ultimately affects the range of possible sentences, is not made without reference to the circumstances of the prohibited act, as was the case in *Mallon.* The arresting officer and/or prosecutor initially determines by what means to charge the individual based upon the circumstances of the crime.

Such an analysis is erroneously premised as just pointed out, perhaps written without perception of the ambiguities of "prosecutor." As to the final sentence of the paragraph, its statement has no support in statutory law, and can only result in confusion. At best, all that a complainant can do is to submit an affidavit (or present testimony) as to the underlying facts which must be to his own personal knowledge and as to which he must swear or aver. There is no room for a determination of "aggravating factors."

*Mallon,* as the majority recites, struck down a statute the effect of which was to double the sentence a prisoner was serving if the prisoner was found guilty of escape or attempted escape. The problem there was that the law mandated the penalty for escape or attempted escape be fixed entirely on the basis of the length of the sentence which the prisoner was serving, and only that. The majority disposes of *Mallon* by determining that the only circumstances taken into account by the arresting officer and/or prosecutor are those surrounding the crime charged, and not some other crime or incident. To that point, there is no problem with the opinion for the Court.

However, the circumstances of the crime of trespass, as determined earlier in the majority opinion, do not include motive concerns. The majority does correctly award Linda Missamore a new trial because of trial court error in admitting over objection testimony of her supposed intent and/or motive in being on Schmidt's property— none of which had any bearing as to Linda Missamore's guilt or innocence of the crime charged. Making it difficult to understand where the majority is going, it first seemingly rejects evidence of motive, and remands for a new trial, but then uses motive evidence as supposed support for the unique dual charging system, all done under the aegis of the rational basis test.

A misdemeanor crime is either committed, or it is not committed. The conduct in question is either criminal or it is not criminal. There are no shades of guilt to a misdemeanor. There are no degrees of simple trespass. For that reason the penalty for committing a misdemeanor should not vary dramatically; some for jail time and a fine, but others by forfeiting a bail bond. Definitely, there is no validity to a

scheme in which the sentence imposed depends upon whether the defendant is charged by complaint *or* citation. There is to my knowledge no statutory law providing conditions and provisions whereby some person may be hailed into court by citation, and others by complaint and summons. A misdemeanor is a misdemeanor is a misdemeanor. On conviction, it is grossly arbitrary that, of two defendants charged with breaking the same criminal statute, one may be subjected to a penalty greater than the other defendant, only because of two co-existing schemes for making the initial charges.[4]

The appeal record in this case does not reveal that the prosecuting attorney or the magistrate ever informed Missamore of her right to, and the advantage of, being charged by a citation. But yet a district court cannot accept a felony guilty plea without going through a long litany of questions aimed at establishing that a defendant is aware of the rights being waived. Why then should a magistrate court not be equally fair and magnanimous with uncounseled misdemeanants? (The fully informed defendant facing a felony trial also has counsel present when the district court is telling the defendant what counsel very likely has already explained.)

We have before us the classic case of a criminal prosecution which better would have been relegated to a civil action where *both* parties would have to pay for the luxury of litigation. The testimony taken at the criminal prosecution establishes beyond any cavil that if Linda Missamore was guilty of unaggravated trespass by stepping onto real property which was owned by the Schmidts, that same testimony also establishes beyond cavil that Sheila Schmidt committed a battery upon the person of Linda Missamore. Both events hap-

pened at the same time on the same day, May 31, 1986, Memorial Day.

The Memorial Day Classic mainly involved only Linda Missamore and Sheila Schmidt, although it was claimed, and possibly true, that LeRoy Schmidt, Sheila's husband, shouted at Linda from his home. Both families lived on the same road and were neighbors who did not neighbor, and in fact had nothing to do with each other. Yet, the events which took place that day would lead to Mrs. Schmidt calling the police, and then going before a magistrate to charge Linda with the crime of trespass. Unexplained in the record, and perhaps inexplicable, somehow this resulted in Linda Missamore being jailed until a neighbor came to her rescue.

One lesson learned from the history of this affair is that it pays to be the first to call the police, thereby becoming instead of a party bringing a civil suit, only a prosecution witness who can sit back and enjoy watching the might of the government prosecute your neighbor for having committed the crime of trespass. The law is such, and has been at least since the time I was exposed to the teaching of law, that no intent to commit a trespass is required in order to pursue a civil remedy for an alleged trespass onto another's land. All that is necessary is that the act resulting in the trespass be volitional, and that the resulting trespass be direct and immediate. Nor did actual damage need be shown. Any simple trespass justified at least nominal damages. Other trespasses where there was injury to person or property could result in considerable damages.

Such being the state of the law, it is somewhat startling to find that the police intervened in this case and apparently aided Sheila and LeRoy Schmidt and apparent-

---

**4.** This Court in *Mallon* wrote:

So it may happen under this section that two men attempting or effecting an escape from the penitentiary on the same day, in concert, under precisely the same circumstances, and with exactly equal guilt, would receive wholly different punishment. If one had been confined but for a day, his punishment would be increased but by one day, while the other, who might be sentenced to a further confine-

ment for that number of years.... Can this be said to be an impartial administration of justice? Can it be said to be affording to all individuals the equal protection of the laws? The inherent vice of such an enactment is not fully apparent.... We are not disposed to strain our construction of constitutional safeguards to uphold such a statute.

*In re Mallon,* 16 Idaho 737, 746, 102 P. 374, 376 (1909).

ly encouraged them to initiate a criminal prosecution against Linda Missamore for coming onto the Schmidt property. It was conceded at trial by the prosecuting attorney that Linda did no damage, only spoke when spoken to, and offered no resistance to the battery committed by Sheila Schmidt. There was no claim that Linda used any vituperative or vilifying language. She was heard to say and admitted saying only that she was on county property. That was the genuine issue. Both Schmidts and their neighboring friend testified that although Linda was first seen walking down the roadway, she then walked on a strip of county right-of-way (to which the road was adjacent), which was fully covered by a grass lawn which was indistinguishable from the lawn within the Schmidt curtilage, which Schmidt and the three state witnesses accused Linda Missamore of coming onto.[5]

Another, but non-genuine issue, was the long standing theretofore undisclosed obsession of the Schmidts and their pretrial reindoctrinated neighbor, Sprague, that Linda Missamore had been instigated by another neighbor, Bonnie Elliott, to trespass on the Schmidts' property so as to harass them. Bonnie Elliott was a person with whom the Schmidts declared they would have nothing to do.

We have no reason to want to know of the expense to the state of Idaho and/or the county of Kootenai occasioned by this criminal prosecution. It is enough to know that of the two parties involved in the alleged trespass—if such it was—only the Missamores have had to retain counsel. Counsel defended them at trial. Counsel appealed the conviction to the district court. Unsuccessful there, counsel's further appeal was heard by the Court of Appeals but unsuccessfully. A petition for rehearing of that court's decision was unsuccessful. This Court granted review, and in due time, five justices read the briefs and heard oral argument, conferred

and reached a decision which was embodied in a written opinion, issued April 24, 1990. The conviction was reversed and the cause remanded. The opinion of the four to one majority encompassed twelve pages, and was contested by a dissenting opinion of equal length. The attorney general filed the State's petition for a rehearing. A rehearing was granted, and the parties thereafter presented us with another round of oral argument. A new opinion for the Court has now been authored, but again fails to obtain a unanimous opinion. The State's petition for rehearing was supported by a twenty-six page brief which primarily addressed such rather meaty substantive issues as whether defense counsel's equal protection claim should be evaluated on the basis of a rational relationship, rather than being subjected to strict scrutiny. The brief relies upon and cites to ten Idaho appellate decisions, to fourteen decisions from the Supreme Court of the United States, and to three decisions from the District of Columbia Circuit Court of Appeals. It is a brief of such calibre as one would expect to see filed in the Supreme Court of the United States, and perhaps is a clue as to how far the State is willing to go in vindicating the attorney general's views that this Court travels on a wayward course.

All of the foregoing five appellate reviews ensued from Linda Missamore's post-sentencing contention that she was selectively, unfairly, and unequally dealt with in being charged by complaint and tried by a jury. Such unique circumstance comes about by reason of the sad state of procedural law in Idaho which by *statute* provides for prosecution of misdemeanors by complaint and jury trial whereas a prosecution brought under court-promulgated *rules* provides only for a charge by citation, and trial by a magistrate court. The utmost unconscionable result, as so would appear to any ordinary lay person with well developed perceptions of what is right and

---

**5.** Mr. Schmidt testified that the law on the county right of way which was not macadamized for vehicular traffic had been planted by him and was maintained by him. He stated that the width of the lawn on the right of way was ten to nine feet in width. He conceded that he did not own the strip, but believed it was his lawn because of his effort, all of which appears verbatim farther along in this opinion.

what is wrong, is that the unfortunate citizen who is singled out for "the works," *i.e.*, charged by complaint, tried to and convicted by a jury, is subject to a possible judgment imposing six months jail time *and* a $300 fine, whereas other defendants are allowed to have the slate wiped clean by posting a $50 appearance bond which is thereafter forfeited, which closes the case.

The opening brief on appeal filed on behalf of Missamore reminds us of a Court rule:

> **M.C.R. 1** states that:
>
> These rules shall govern the procedure in the magistrate's division of the District Courts of the State of Idaho in all misdemeanor criminal proceedings which are triable by the magistrate's division *whether brought before the court by an Idaho Uniform Citation or a sworn complaint . . . .*

This Rule would further support Appellant's contention that the bond forfeiture provisions of **M.C.R. 14** apply to complaints as well as citations.

> The Procedure for forfeiting bond, should therefore, be found to apply to sworn complaints as well as citations. If so, the Appellant was free at the time she was charged, to enter a written plea before the Clerk and forfeit the FIFTY DOLLAR ($50.00) bond she had posted as payment of a fine and court costs.
>
> The Appellant, however, did not do this. She chose to exercise her constitutional right to counsel, her constitutional right to a jury trial and all other constitutional rights available to her. She did this by contesting the charge against her.

Appellant's Brief, 12–13. The brief goes on to argue:

> A sentencing structure which increases the possibility of the maximum sentence a person can receive because they, instead of pleading guilty, exercise their constitutional rights, is itself unconstitutional. On an objective basis concerning the facts of this case, while Appellant faced only a FIFTY DOLLAR ($50.00) fine if she entered a written plea of guilty, she faced a THREE HUNDRED DOLLAR ($300.00) fine and six (6) months in jail as a direct result of her desire to exercise her basic constitutional right to contest the charge against her. Appellant was not fined just FIFTY DOLLARS ($50.00) as she would have been if she had entered a written plea and not exercised her constitutional rights. She was sentenced to thirty (30) days in jail, with all but five (5) days suspended and fined ONE HUNDRED DOLLARS ($100.00), plus costs.

Appellant's Brief, 13–14.

The State, instead of taking a stance on the foregoing, has chosen to engage the defendant in constitutional combat with apparently no one remembering the innocuous genesis of the controversy. That genesis was not of sufficient stature to have turned a misdemeanor charge of simple trespass into a constitutional confrontation which has up to now resulted in five appellate court hearings, perhaps, and only perhaps terminating with the opinion for the Court which issues today. This case is the likes of which, if the underlying controversy had been properly handled, should not have gone to court, and once there, if properly handled, might not have gone a long and tortuous route. It is the type of neighborhood controversy which in the earlier days of North Idaho did not end up in criminal prosecution. If it was going to get into court at all, it should have been a civil damage action for non-injurious trespass. Just why the prosecutor jumped in on behalf of the Schmidts is unknown, other than that the Schmidts invoked the aid of local police to investigate a "crime scene" where no property was damaged, and no person was injured. The police apparently had no other real criminal activity to which they could direct their attention.

If the police ever interviewed Mr. or Mrs. Missamore before directing the Schmidts to a magistrate, I am remiss in the review which I have made of the appeal record, including both the transcript and the clerk's record. To the end that this case will not return, on again reading the trial testimony, the conclusion was reached that

it might be in the public interest to disclose the trial testimony which the prosecutor placed before the jury, and which was pertinent to the charge of trespass. The opening statements of counsel alone should have alerted the trial judge that he was presiding over a case of no real consequence, and which would better have been a civil action in Judge Wapner's court. The presiding judge, however, was not the same judge who held the probable cause hearing and allowed a summons to issue. He fell heir to this case when he was assigned to hear it. Therefore, it all came about on a national holiday of remembrance that the Schmidts, on their belief that neighbor Bonnie Elliott had instigated the Missamores to mentally harass the Schmidts, initiated a criminal litigation which has turned out to be a cause celebre, and consumed untold hours at all levels of the Idaho judiciary:

## OPENING STATEMENTS

[Prosecuting Attorney]: Basically, she stood, there, right in the middle of the lawn, at a point that is twenty to thirty feet onto Sheila and LeRoy's lawn. Ah, Brian Sprague ... Sheila Schmidt will testify and LeRoy Schmidt will testify, ... that LeRoy Schmidt first asked this defendant to leave, she would not leave. They will tell you that they've had this sort of problem with this defendant before. She would not leave. Sheila Schmidt came out of the house and asked this defendant "Would you please leave the lawn", "Would you please leave our property" or words to that effect. And the defendant said words to the effect, "No, I'm not leaving, this is county road", or words to that effect. She was clearly in the middle of the lawn, clearly on the lawn that the Schmidt's owned and that they occupied. You will hear testimony from Brian Sprague, who is a neutral non-biased witness in this case. You will hear testimony from Sheila and LeRoy Schmidt that the defendant rather than leaving she stood there. She stood there for about two minutes as if she was trying to provoke some kind of confrontation. Basically, ... that is our case. We're *not alleging* that the defendant damaged the Schmidt's lawn in any way. We're not alleging that she broke any of the shrubbery, or dug up their lawn, or trampled ... trampled over their garden. This is a ... trespass case.

....

[Defense counsel]: On the day that this took place my client was walking along Cloverleaf Road. She walked past ... there's several neighbors on both and I would imagine that testimony will establish where each one lived, but she was walking along Cloverleaf Road when she got to where the Schmidt's lived. She walked along the lawn which was not on Schmidt's property. It was a piece of lawn that was maintained by the ... Schmidt's but it was not on their property. She walked down to the corner of the property ... I guess across the property and down to the corner, across the front of the property following her husband. He was quite a ways away from her, and she decided she wanted to go back and visit a friend of hers that lived up the road from where she just came from. She went back up ... up, again, to get on this strip that was still on the county right-of-way, and realized that her friend wasn't home, and, then, decided she was going to go see another friend and she was walking back down here, still on the county right-of-way although on the lawn that was maintained by the Schmidts. She was confronted by Mrs. Schmidt who told her that ... that "You are on my property and you're going to get off my property"; and my client says "This is not your property, this is county right-of-way". At that point in time Mrs. Schmidt started pushing her, she pushed her off into the roadway, and my client left. She went down and visited ... her friends, I believe the Bromleys, for about an hour and, then, she ... when she left that place there were sheriff' officers there, and she was arrested and taken to jail.

....

DIRECT EXAMINATION OF LEROY SCHMIDT BY MR. DOUGLAS:

Q. All right, Mr. Schmidt, a ... why is it that you asked her to leave your property?

MR. RUDE: I'd object, Your Honor, it's irrelevant.

THE COURT: Overruled.

Q. (By Mr. Douglas) Please answer the question.

A. Why did she come on my property?

Q. No. Why did you ask her to leave your property, Mr. Schmidt?

A. She's a—Ah, she had no reason to come up there with her dog that I could see. She was just harassing.

MR. RUDE: I'd object, Your Honor. It's conclusory and ... it's calling for a statement of mind on the part of my ... my client and I'd move to strike that last portion.

THE COURT: Overruled.

Q. (By Mr. Douglas) All right, would you ... you say she came on just to harass you?

A. Well,—

MR. RUDE: I'd object, as leading, Your Honor.

MR. DOUGLAS: Well,—

THE COURT: Well, he has already said that's what he thought that ... why she was on the property. So I don't ... I'm going to overrule it. Go ahead Mr. Douglas.

A. ... In the past she's drove in our driveway with her truck.

....

A. Well, a ... maybe I misunderstood you, Judge, I can't say anything—

THE COURT: Just answer his question.

MR. SCHMIDT: Okay.

THE COURT: He asked you why you thought she was harassing?

A. Well, she's ... she's driven across the lawn—

MR. RUDE: I'd object, Your Honor, foundation ...

MR. DOUGLAS: Your Honor—

THE COURT: Overruled.

Q. (By Mr. Douglas) Continue to answer the question.

A. Okay. She's pulled into the driveway before and deliberately driven across the lawn for no apparent reason at all any number of times, for no apparent reason.

Q. Now, when did that last happen, prior to May 31, 1986?

A. Oh, it's been going on for two years.

....

CROSS–EXAMINATION BY MR. RUDE:

Q. You would ... you would agree with me that ... on plaintiff's exhibit # 6, that part of the lawn you maintained is not on your property?

A. Ah, that's county access. That, I understand, is county access.

Q. Well, you're not claiming that ... that you have the right to control who walks on this strip of property that's about nine feet in width from this monument, here, to the edge of the roadway; are you?

A. No, not unless they're ...

Q. Okay.

A. ... destroying it or tearing it up or whatever.

Q. Do you feel that you can tell someone not to park on this way? ... on this property that's a ... county right-of-

A. I ... I talked to another ... ah, got another opinion and if it damages the lawn then those people are liable, because that's my grass, my time and my effort behind it ...

Q. But ...

A. Until the county takes it.

Q. ... but you would ... you're not taking the position that you can tell someone not to walk on ... on this area that's about nine feet in width that is county right-of-way; are you?

A. If they wanted to walk through there, I guess they could walk through there.

Q. And you would have no control over that?

A. Not if they weren't damaging the lawn.

Q. Okay, and was Ms. Missamore damaging your lawn?

A. No, but she came up farther than that, she trespassed.

**46**

....

Q. All right. And ... then, did you continue to look out the window after she came onto the county right-of-way and past your driveway and walked east?

A. Yes.

Q. All right. Go ahead and sit down. And ... what did she do then?

A. She walked over to the end ... end of the lot, turned around and started back.

Q. All right. And did you see Dennis Missamore ...

A. No.

Q. ... during that ... you know who he is don't you?

A. Yes, I do.

Q. All right. Ah, did you have your sprinklers on that day?

A. Oh, I water all the time but it wasn't on at ... at that time. No.

Q. You'd say that the sprinklers were not on ...

A. No.

Q. ... at the time that Mrs. Missamore was walking?

A. No.

Q. All right. Now, when Mrs. Missamore, I guess, turned around on the east side of your property and started back across your lawn; that was the point in time when you told your wife to go out?

A. I told my wife and she went out the side door.

Q. All right. And, then, you continued to watch through the window?

A. Yes, I did.

Q. All right. And she first contacted Mrs. Missamore behind the tree?

A. Right where I drew the circle, there, right in that area.

Q. All right. And did ... did Mrs. Missamore continue walking at that point in time, or did she stop and talk to your wife?

A. Well, as I remember, they ... they kind of stopped for ... for a second and, then, she ... she kept on going, but she wouldn't leave the yard. She went right on through clear to the end before she cut down.

Q. Well, did she say anything about that being on county roadway ... county right-of-way; did you hear her say anything like that?

A. I can't tell you if she did or not.

Q. Well, what did ... what can you recall that she said?

A. I can remember my wife telling her to leave the ... get off our property.

Q. Well, could you hear what Mrs. Missamore was saying?

A. She said something and it might have been that. I ... it might've been "This is county road".

Q. Well, okay, but you earlier ... you don't recall exactly what she said?

A. What she said?

Q. Mrs. Missamore said?

A. When I talked to her or when my wife talked to her?

Q. When your wife talked to her.

A. She said something to that effect that this is county property.

Q. All right, "I don't have to, this is a county road."

A. Something to that effect, yes.

Q. All right. What else did she say? Is that all that you heard her say?

A. My wife kept telling her to leave.

Q. And what did Mrs. Missamore say?

A. She just kept going.

Q. Well, do you ... do you know ... do you remember any other statements, other than this one statement "I don't have to, this is county road".

A. No, that's the main thing that sticks in my mind right now.

Q. You can't remember any other statements?

A. No.

Q. Did you ... did your wife ... what did your wife say about whether or not that was county road; did she say anything to Mrs. Missamore?

A. She told her to just get off the property.

Q. All right, did she say anything about the fact that this isn't county road, this is our property, or anything like that, that you can recall?

A. Not that I can recall.

Q. Did your wife ... touch Mrs. Missamore at all?

A. Yes, she did. She put her hand on her shoulder just before she left the property, but it was no push ... it ... just put her hand on her shoulder.

Q. You don't know why she did that—do you?

A. No, I don't.

Q. All right, and that occurred ... where?

A. That was at ... that was at the edge of the property.

Q. All right.

A. Yes.

Q. All right, That would be on the western edge?

A. Yes.

Q. All right. And, then, did Mrs. Missamore ... was Mrs. Missamore off your property at the point in time that that occurred?

A. I'd say that'd be a judgment call. I ... it would be that close. I mean, if you're going by the county access, the ten ... the nine feet, it would be right in that area.

. . . .

Q. Now, you mentioned in your testimony that ... Mrs. Missamore had ... parked her car on your lawn?

A. No, I didn't. You misunderstood me.

Q. Okay. What did ... what—

A. She's pulled in any number of times ... pulled in our driveway, backed up, and, then, cut right off across the grass, deliberately.

Q. The grass meaning the ... county right-of-way, or your lawn, or ... or what?

A. It would be the county right-of-way but it's still a lawn.

Q. Okay, she's turned around in your driveway?

A. And run across the lawn on purpose.

Q. Across the ... on the count ... on the lawn on the county right-of-way?

A. The lawn on the county right-of-way.

Q. All right. And what vehicle has she been in that she's done this?

A. Both ... a Chevrolet pickup and her Wagoneer.

Q. How about Mr. Missamore; has he done anything like that?

A. Yes, he has.

Q. When's the last time—How do you know who's in the ... who's driving the vehicle?

A. Well, the last time that Dennis Missamore did it, I was out in the driveway, standing in the driveway washing the car when he did it.

Q. All right, well, when's the last time that Linda Missamore did this?

A. About three days after we brought charges against her.

Q. You saw this?

A. Ah, no, I didn't see her do it ... the ... I wasn't home, the neighbor did.

Q. Well, we ... so you don't have any personal knowledge of that at all then, yourself?

A. For that offense.

Q. All right, when's the last time that you personally observed Linda Missamore ... turn around in your driveway?

A. It'd have to be ... probably a week or two weeks before we made the charge, so it'd be the middle of May, right in there.

Q. Nobody else was there ... ever turned around in your driveway?

A. Lots of people turn around in my drive ... well, not a lot. People turn around in my driveway but I don't have trouble with people turning around in my driveway and, then, purposely driving onto the grass, hooking across the grass for no apparent reason.

. . . .

Q. You complained ... have you complained to the County, at all, about these incidents where they a ... you claimed that Linda Missamore's driven across the county roadway ... the lawn portion; have you filed complaints before against Mrs. Missamore?

A. No. No, I haven't.

Q. Have you complained about ... snowmobiles or anything like that with respect to Mrs. Missamore?

A. Not to Mrs. Missamore ... because I've never seen her on a snowmobile.

....

REDIRECT EXAMINATION BY MR. DOUGLAS:

Q. Do you have any explanation why she would choose your driveway to ... to go into?

A. Just to harass us is all.

Q. Now, what other—You mentioned that ... you suspected that someone, another neighbor, was putting her up to this, ...

A. Yes.

Q. ... who was that person?

A. Bonnie Elliott, which is two houses up from us.

Q. All right. You mentioned ... you told the jury that you were having some problems with Bonnie Elliott.

A. We have since we have moved in out there.

Q. What were the problems you were having with Bonnie Elliott?

A. Well, everything, from a ... her kids running their snowmobiles and their bikes across the lawn, to not wanting to put up a ... a fence for their cattle. It's not an open range area and you have to fence your own livestock.

Q. How would you portray your ... your relationship with ... with the Elliotts?

A. We just don't want anything to do with them, period.

Q. Okay. Have you ever made that known to them?

A. Oh, yes.

Q. How many times have you seen this defendant go over to the Elliotts' house?

A. Every day just about. They're very good friends....

DIRECT EXAMINATION OF SHEILA SCHMIDT BY MR. DOUGLAS:

A. Ah, Linda was walking from her home, which is up in this area, coming down the road and she came to our property line. She came into the property, proceeded into our property, behind our water meter and tree, on down off the property and back onto the road. She was walking a small brown dog on a lead.

Q. Okay. And did she return?

A. Ah, while she was making her crossing, during this time, LeRoy a ... stood up, said out the window, the windows were open, 'Mrs. Missamore, please get off my property ...'

Q. Okay.

A. ... Ah, she countered, 'No, I don't have to.' He repeated, 'Mrs. Missamore, please get off my property,' and she continued on down.

Q. All right. And, then, what happened?

....

A. Ah, it appeared that she had just simply left the area. Ah, I didn't pay that much more attention. I went into the kitchen and I started a ... arranging whatever was on the stove or taking care of whatever was on the stove so I was in the kitchen area which ... I have no view then out the window. And LeRoy said to me, "Linda's returning". We have a side door a ... rather than the front door, that our family uses as normal practice and, of course, the kitchen area is back in there.

Q. Okay.

A. I came out the side door and proceeded towards the street and I met Linda into our property again.

....

A. And I a ... walked with her and I said, "Linda, get off our property", and she said, "I don't have to". I repeated myself, said, "Linda, get off our property". "No" she says, "this is county road and I don't have to". I repeated myself a third time. The fourth time I put my hand on her shoulder. I didn't grip it. I didn't like to but I didn't ... I just laid it there as a gesture. I said very firmly, "Get off our property". "No, I don't have to". I said, "Fine, I'll go call the Sheriff", and I turned heel, and—

....

A. The distance from the road? Oh, I would say that she was still ... still twenty feet into our yard.

....

Q. Now, how long was this exchange ... between you and the ... you and the defendant, when you went out and asked her those four times and placed your hand on her shoulder; how long did that last?

A. That probably lasted a good five minutes.

....

Q. Okay. Now, Sheila, was there a reason why ... you asked her to leave your property?

A. Oh, definitely.

Q. What was the reason?

A. First of all, we do not care to have members of the Missamore family on our property, involved with our family, involved with our personal property, that is our personal preference.

Q. Well, what ... what other encounters have you had with Linda Missamore to, perhaps, cause you to ask her to leave your—?

A. Well, in the ... in the past, we've had a ... Linda pull into our driveway, completely into the driveway, her car totally off the roadway a ... no vehicles coming, sit there for a minute, back up, turn the wheels come across the lawn. We've had that happen with her husband. We've had them a ... ride their horses across our property. Ah, it just ... it just—

Q. Over what period of time has this taken place?

A. Well, especially in the last year ...

....

CROSS–EXAMINATION BY MR. RUDE:

Q. Well, where was Mrs. Missamore walking when you first saw her?

A. She was walking into our property, coming between our trees.

Q. She was between the trees?

A. She was coming onto the property. May I? Now, this is the first time that she crossed the property ...

....

A. ... She was coming from her home direction and then coming into and, then, down.

Q. All right where, when you first saw her?

A. I ... it seems to me she was right in this area.

Q. All right. Now, ... is there any portion of your ... your lawn, or the lawn in front of your house, that is not on your property?

A. We maintain grass to the edge of the county road.

Q. All right, and how much of that grass would be on ... county right-of-way?

A. From what I understand, if you measure from the center of the road and measure twenty feet from the center there's approximately seven, eight, nine feet that is county a ... right-of-way ...

....

Q. All right. And, then, ... at that point, Mr. Schmidt yelled out the window ... "Get off our property"?

A. "Mrs. Missamore, get off our property".

Q. All right. How many times did Mr. Schmidt state this out the window?

A. I believe he said it twice.

Q. No more, no less?

A. I believe it was two times.

Q. All right. And ... your testimony is that Mrs. Missamore responded both times?

A. She responded that she did not have to.

Q. Did she say anything about being on the county right-of-way, at this point in time?

A. Not to my husband, ...

Q. All right.

A. ... not that I'm aware of.

Q. And ... when your husband first talked to her, was she in the area where you first saw her; is that about ... did that all happen about the same time?

A. Yes, it ... it seemed to all click at once. Yes.

....

Q. All right. And, then, when did you next see her again?

A. Ah, LeRoy said to me, "She's coming back onto the property". I went out our side door ...

Q. All right.

A. ... and met her on the property.

....

Q. All right. And ... you ... you told her to get off your property, again, then?

....

A. Now, that's when I told her to get off the property I had not spoke to her prior to that. That's when she and I walked the distance of the yard together.

Q. All right. And did she say anything to you about being on county right-of-way?

A. She says a—I said, "Linda, get off our property;" she says, "No, I don't have to;" I said, "Linda, get off our property;" she says, "This is county road, I don't have to"; I repeated myself again and she said, "No;" I repeated myself the fourth time and said I would call the Sheriff.

Q. All right, and, as you were doing this, you were walking along?

A. We were walking along the yard, yes.

....

Q. All right, you were twelve feet from your fence when you put your hand on her shoulder?

A. Um-hmm.

Q. All right. And ... she was still how far from the pavement?

A. Probably about the same distance. She still had to curve down to get back onto the pavement.

Q. Twelve feet from the pavement?

A. That's probably a good judgment.

....

Q. All right. And, then, she—And, then, after you put your hand on her shoulder, then she went out?

A. I presumed that she left because, at that point, I turned on my heel and went in to use the telephone.

Q. All right. Well, you didn't watch her go off your property?

A. I did not watch her go completely off the property, no. I was angry.

Q. And ... did you see her ... at any time after that?

A. No, ...

....

Q. All right. Now, you mentioned that Linda Missamore drove one of her vehicles or ... do you know how many vehicles the Missamores have?

A. To my knowledge, they have two.

Q. Do you know what kind they are?

A. One's a a ... Jeep Wagoneer and one is a blue and white pickup with racks. I believe it's a Chevrolet but I cannot tell you that positively.

Q. When's the last time you've seen either one of those vehicles in your driveway?

A. It was in early Spring, I believe April was one date.

Q. All right, which vehicle did you observe?

A. That would've been the Wagoneer.

Q. Okay, and, now, was Linda driving it at that time?

A. Yes, it was. Yes, she was.

Q. Was your sprinkler on that day; do you recall?

A. Yes, it was.

Q. All right, and where was the sprinkler at when ... all this was happening?

....

Q. Have you talked to Mr. Sprague about this case?

A. Yes.

Q. How many different occasions?

A. Ah, I did ask him if he would a ... testify because he had moved away, in fact, before he left, we discussed that, if he would testify, and he said yes, he would.

Q. Okay, well, how many different times have you discussed this case with Mr. Sprague?

A. Maybe three or four times. I don't think a highly number of times.

Q. This morning, as well?

A. Sure.

Q. At the Prosecutor's Office?

A. Yes.

Q. Did you ... have him prepare any written statement for ... with respect to this case?

A. He did not prepare a written statement, ...

Q. All right. Ah, you did?

A. I did.

Q. Did you furnish that to Mr. Sprague?

A. Yes, I did.

Q. When did you do that?

A. I did that a ... yesterday.

Q. What was your purpose for doing that?

A. Only because so many things had happened, and it happened so quickly, I felt I needed it for my mind and my time, and I gave him a copy just for the times and the date.

Q. To refresh his memory about what happened, as well?

A. No, I don't think so because he ... he knows very clearly what happened.

....

DIRECT EXAMINATION OF BRIAN SPRAGUE BY MR. DOUGLAS:

Q. Brian, ... do you recall May 31, 1986, about 7:00 in the evening?

A. Yes, I do.

Q. What were you doing, Brian?

A. Ah, I had just finished a ... mowing the lawn that day and I had ... had my water sprinkler out watering the lawn. I had a ... just finished dinner with my two children and I was sitting on the couch at the time and had the television on. I believe I was watching a ball game at the time.

Q. Okay. And did you see something?

....

A. I looked out the window and I saw Dennis Missamore walking up the road towards his place.

....

Q. Then, what did you see?

A. About ... about ten minutes later I saw Mrs. Missamore walking the same direction from ... when I first spotted her was just at the property line of the Schmidt's place, here ...

....

Q. Okay, why did you just observe her ... why did you have to observe her?

A. Ah, well there was a ... problems between her and the Schmidts and ... so I just watched to see what a ... if anything, or what was going to happen ...

....

A. ... and a ... I watched her directly walk onto their property.

Q. How many times, if at all, have you seen Linda Missamore walk down that road?

A. Several times.

Q. All right, a ... how would she walk down the road on those several times that you saw her.

A. She would walk on the blacktop until she got to the Schmidts' place.

Q. Then, what would she do?

A. Ah, automatically, just intentionally, walk over onto their property every time.

Q. All right. And over what period of time did you observe her do that ... walk down the blacktop and turn onto the Schmidts' property?

A. Ah, since I had returned, basically, in February ...

Q. All right.

A. ... at different intervals. I was not working, so I was at home all the time.

Q. Okay. What about a—Well, let me ask you this; how did you know that this person was Linda Missamore?

A. Ah, ... Linda Missamore ... I had met her when I first came to that area, in that house, and her daughter Ellie had babysat my two children.

Q. Okay. When was the last time that Linda's daughter Ellie had babysat your two children?

A. Ah, 1982, before I left to go to Alaska.

Q. All right. When was the last time, prior to May 31, of '86, Brian, that you had seen Linda Missamore?

A. Ah, ... oh, I probably could've seen her just a couple days before or a few days within ... I'm sure within the week. I'd seen her through the neighborhood quite often. She goes to the Elliotts quite often, so ... I would see her there.

. . . .

Q. All right. And what did you observe after you saw her cross onto the Schmidts' property?

A. Ah, I saw ... actually I heard Mr. Schmidt yell out Linda ... or "Mrs. Missamore, please get off the property." Ah, she kept walking, back again. Mrs. Schmidt came out of her ... of the house, approached her and said "Linda, stay off the property." Ah, I then heard Linda say "I don't have to ... this is county property."

. . . .

Q. How many times did you hear Mrs. Schmidt tell her to leave the property?

A. Ah, about three times that I recall.

Q. Okay. And what other responses, if any, did you hear from the defendant other than "I don't have to, this is county property" or something like that?

A. That's basically what ... all she said.

. . . .

Q. Let me see, Brian, from what you know ... do you know why the defendant walked onto the Schmidts' property?

A. I have no a ... you know, a valid reason why she would do it. I have my own judgment as to why but I don't—

Q. Based upon your previous observations?

A. Right. Exactly. I—

Q. What is ... what is that?

A. Harassment. It's been going on for a long time and that's exactly—

MR. RUDE: I'd object, foundation, and move to strike.

THE COURT: Overruled.

. . . .

CROSS–EXAMINATION BY MR. RUDE:

Q. ... Mr. Schmidt said something out the window?

A. Yes, I believe he ... I didn't exactly catch exactly what he heard, but I knew he was saying something to her.

Q. You didn't hear what he said?

A. No, not, ... I couldn't say verbatim what he said.

Q. And she didn't say anything to him; is that correct?

A. I don't know, I didn't hear anything.

. . . .

Q. ... do you recall whether or not Mrs. Schmidt touched Linda Missamore at any point in time?

A. Yes, I do.

Q. Okay, and what happened? What'd she do?

A. She just put her hand on her shoulder very lightly and said, "Please get off of our property" or "Linda, please get off of our property," ...

Q. All right. What then—

A. ... just like laid it on there.

Q. How many times did she do. this? Just once?

A. What—touching her?

Q. Yah.

A. Yes.

Q. How many times did she say "... get off the property"?

A. Ah, I'd say about three or four times.

. . . .

Q. All right. And at what point in time did ... Linda Missamore leave the Schmidt's property?

A. She never really did leave the Schmidt's property. I mean, if ... if you're going to count the lawn ... I'm saying the lawn, you know, I mean she came up after Linda ... or Mrs. Schmidt went back into the house ... Linda went to this point, right there, so she never went off the lawn at all.

. . . .

REDIRECT EXAMINATION OF BRIAN SPRAGUE BY MR. DOUGLAS:

Q. And what was Mrs. Schmidt saying?

A. "Linda, please get off of our property," I believe is the exact words.

Q. And what was the defendant saying?

A. "I don't have to" a ... that ... I think I heard that once and, then, once she said, "I don't have to, this is county property."

Tr. 14–105.

As a final word, consider this: Part of the statutory law establishing the power

and authority of certain law enforcement officials to set up road blocks for the purpose of apprehending persons reasonably believed to be wanted for violations of the law makes it a misdemeanor for any person to travel through a road block without subjecting himself to the traffic control. I.C. §§ 19–621 and –623. Anyone "running" a roadblock is guilty of a misdemeanor, and shall be punished by fine of not more than $300, or by imprisonment in the county jail for not more than six months, or by both fine and imprisonment.

A and B are approaching a visible road block while on their way across town, where they have matters to attend to. Neither are wanted desperados, and neither have been convicted of anything. Both are law abiding men of the cloth, and are proceeding to a meeting with elders of their church; they are already late for that meeting. Knowing quite well the difference between right and wrong, but having had no exposure to the Idaho statutes which criminalize certain conduct, B, the passenger tells A, the driver, that if they back the car for a distance of fifty yards and into an alley, then they can turn around so as to take an alternate route which will take them to their destination as rapidly as the route which the police have road blocked. They turn around and depart, but not without being noticed by a state trooper possessing the eyes of an eagle. The trooper does not pursue them, but is able to read the license number, and writes it down. The police at the roadblock also see the vehicle abruptly back into the alley and turn around, and two of them are certain that the vehicle had two occupants, but they are unable to give any description.

The police run a license plate check and obtain the name of the registered owner, who is A. When the police go to the residence of A, they find him at home, and B also is there. The police tell A and B why they have been selected for the visit, including the fact that they are both subject to prosecution for a violation of I.C. § 19–623, a statute which to them means nothing. They admit that they were both in a car and joined in making the decision to not go through the road block, but to proceed on their way to the church meeting by the expedient of simply changing their minds about their original choice of route.

The decision is made to prosecute both, although there is some indecision; one voice being heard to say that the statute if properly drawn would have used the words "driver" or "operator" instead of the all-inclusive word "person." But in light of the fact that it was admitted that the decision to avoid the roadblock was made by both, the conclusion is made to accept the law as the legislature wrote the law, and hence there ensues the decision that both should be charged, but separately rather than jointly. The thought is advanced that it might be a better course to pursue A and B by separate charges. Another voice, by someone fairly astute in the law, agrees that a charge of both as co-defendants would make more difficult the prosecuting attorney's task. When separate charging is agreed upon, for fear that if the first prosecution failed, that loss would affect a prosecution of the other law violator, a master strategy is decided upon. There would be simultaneous charges laid against A and against B for alleged violation of I.C. § 19–623. A would be charged with a complaint to be followed by the issuance of a warrant for his arrest. B would be charged by a citation, and so it comes to be that each is so charged. B immediately, on advice of counsel as to the cost of litigation, puts up the Supreme Court rule-promulgated appearance bond of $50, and forfeits it. A is taken before the magistrate court, and naively believing that no jury would convict him of conduct which he deemed absolutely rational, tells the court that he prefers to take his chances with a jury. So he pays an attorney and takes his chances. Because of his own earlier admission to the officers that he participated in the decision to back out of the road block and proceed to the intended destination by another route, a properly instructed jury finds him guilty as charged. The jury was given to understand that even a truthful claim that he did not intend to violate the law did not exonerate him where he clearly had violated the statute.

All of which is rather boring, even to the writer, but it is a good example of what is wrong with the legislature of the sovereign

state of Idaho having established a procedure for the prosecution of misdemeanors, as is clearly its right, but then the Supreme Court of Idaho sets up an alternate procedure for prosecution by citation. Thus it comes about that A and B, whose complicity in a single misdemeanor is equal, are punished differently. A, who was possessed of a strong belief in favor of the jury system is fined $300, and sentenced to three months in jail, and is assessed costs of prosecution. B, of course, fares much better by taking the easier and less costly route of eschewing the services of an attorney and putting up a small bond which is forfeited. The two of them later, on comparing notes, are not well pleased with a system which fosters such disparate results. Does this case sound like the example set out above which was taken from the *Mallon* opinion? Does it appear to be similar to the Missamore Misadventure? Does something need to be done about legal legerdemain which produces such an absurdity? Any two letter word as an answer will be wrong. Only a three letter word need be tendered.